**The STATE of Texas, Appellant,**

v.

**Jay JOHNSON, Appellee.**

**No. 01–93–00287–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

March 2, 1995.

Rehearing Overruled April 20, 1995.

Jim Mapel, Brazoria, Mary Peter Cudd, Angleton, for appellant.

Lloyd D. Stansberry, Joseph Hunter, Alvin, for appellee.

Before COHEN, WILSON and ANDELL, JJ.

## OPINION

ANDELL, Justice.

The State brings this interlocutory appeal from the trial court's orders granting five motions to suppress physical evidence pursuant to TEX.CODE CRIM.P.ANN. art. 44.01(a)(5) (Vernon Supp.1995). Appellee, Jay Johnson, is charged with capital murder [1] in the shooting death of Edwina Prosen, his alleged common-law wife.[2] In 13 points of error, the

---

1. The indictment alleges that Johnson killed Prosen for life insurance proceeds, which raises the charge from murder to capital murder. TEX. PENAL CODE ANN. §§ 19.02, 19.03(a)(3) (Vernon 1989 & Supp.1995.) The State gave notice of its intent *not* to seek the death penalty.

2. Whether Johnson and Prosen had entered into a common-law marriage is a matter of dispute.

State asserts the trial court erred in each order to suppress evidence obtained in five searches. We affirm all five suppression orders.

Johnson and Prosen jointly operated the Sweeny Funeral Home. They lived together in the upstairs portion of the building that housed the funeral home. Johnson owned the funeral home business, and Prosen owned the hearse they used in the business. Early on Sunday morning, September 29, 1991, Johnson called the Sweeny Police Department and reported that Prosen had been shot. The police arrived promptly and searched the funeral home. Over the next two-and-a-half weeks, the police conducted several more searches of the funeral home and the hearse. Johnson complains that each search was unlawful, and that the evidence gained from each should have been suppressed. The trial court agreed with Johnson in large part, and granted most of his suppression motions. The State appeals five orders to suppress. Each one must be considered in turn.

Johnson complained of evidence obtained from the following searches:

(1) Officers searched the Sweeny Funeral Home *without* a warrant on the day they received the report of the shooting, September 29, 1991.[3]

(2) Officers searched the hearse on September 30, 1991, *without* a warrant when they apprehended Johnson driving the hearse with Prosen's body in it, stopped him, took him into custody, and impounded the hearse.

At several points in its argument, the State relies upon its contention that no common-law marriage existed. Our decision, however, does not depend upon a resolution of this issue.

3. In addition, officers searched the Sweeny Funeral Home *with* a warrant later in the evening on the day of the shooting, September 29, 1991. The warrant was based on information gained in the warrantless search earlier in the day. The State agreed to suppression of the evidence obtained from this search. This search and its corresponding suppression order are not part of this appeal.

4. The trial court granted the first of these motions in part and denied it in part. That order

(3) Officers searched the hearse *with* a warrant on October 1, 1991.

(4) Officers received evidence, handed over to them by the sons of the decedent, that the three sons had taken from the Sweeny Funeral Home over the three-day period of October 1, 2, and 3, 1991.

(5) Officers searched the Sweeny Funeral Home *with* a warrant on October 16, 1991.

The trial court granted all the motions in whole or in part.[4]

[1, 2] On a motion to suppress, the trial court is the exclusive finder of fact and may choose to believe or disbelieve any or all of a witness's testimony. *Meek v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App.1990). The standard of review is abuse of discretion. *Id.;* TEX.CODE CRIM.P.ANN. art. 28.01, § 1(6) (Vernon 1989). The standard of review is the same whether the trial court denied the motion to suppress or granted the motion to suppress. This Court must view all the evidence in the light most favorable to the ruling. To hold that the trial court abused its discretion, we must determine that the evidence would not support a finding that the searches were unlawful.

■ The record contains no findings of fact or conclusions of law. Therefore, this Court must presume that the trial court found whatever facts were needed to support its ruling.[5] This would end the entire inquiry unless the record shows either of the following: (1) that the evidence at the suppression hearing would not support any reasonable finding that the searches were unlawful; or (2) the evidence clearly and con-

stipulated that certain items would not be suppressed, namely, the shotgun, shells, pillow, pillowcases, and bedding that police obtained from the initial search. It also stipulated that specific portions of a videotape of the premises would not be suppressed.

5. At the suppression hearing, the trial court stated its reasons for granting two of the five motions (those motions pertaining to searches four and five). The State agreed to suppress the evidence gained from the warrant search of the funeral home conducted on the evening of September 29, 1991, the day of the shooting. *See* n. 3. The trial court did not state its reasons for granting the other three motions.

vincingly shows that suppression was erroneous as a matter of law.

The trial court granted six motions to suppress, which were directed at six separate, but related, searches. This appeal concerns only five of the six orders. In reviewing these five orders for abuse of discretion, it is necessary to differentiate each search and its corresponding motion. We must analyze separately the facts surrounding each search, to determine whether the trial court could reasonably have found that the given search was unlawful. If the trial court could reasonably have found, from the evidence before it at the suppression hearing, that the given search was unlawful, then its suppression order was proper. We must perform this analysis for each of the five suppression orders.

Each search, and its related motion to suppress, will be taken chronologically, accompanied by the corresponding points of error.

### Search 1:

### September 29, 1991, the day of the shooting; search of the funeral home *without* a warrant. (Relevant to point of error one)

### 1. Facts

Johnson called the Sweeny police at 7:46 a.m. on Sunday, September 29, 1991, and reported that Edwina Prosen had been shot. When Sergeant Davis arrived a few minutes later, Johnson met him at the door and led him into the funeral home and up the stairs to Prosen's body in the bedroom. Sergeant Davis secured the scene and removed the shotgun, shells, pillow, pillowcases, and bedding. Other officers arrived later that morning and videotaped the scene, including the stairs leading to the bedroom, the bedroom itself, and other portions of the building.

The trial court suppressed the entire audio portion of the videotape, which included offi-

cers discussing the possibility of illegal drugs on the premises. The trial court also suppressed the video portion where it showed the opening of drawers in the bedroom, and any portions outside the bedroom or stairway. Finally, the trial court suppressed any items [6] taken from the premises during that warrantless search, other than the shotgun, shells, pillows, pillowcases and bedding that Sergeant Davis had removed. The trial court denied the portion of Johnson's suppression motion that pertained to the shotgun, shells, pillow, pillowcases, and bedding. The trial court refused to suppress these items.

### 2. Analysis

In point of error one, the State asserts the trial court erred in suppressing the remainder of the videotape beyond the bedroom and stairs, along with the other evidence seized in the warrantless search.

In its suppression order, the trial court implicitly distinguished between the evidence that was in plain view and that which was not, but it gave no rationale for its ruling. We must look to the grounds Johnson urged in his motion to evaluate whether the trial court abused its discretion. Johnson claimed that the warrantless search of the funeral home on September 29, 1991, violated the following: (a) the fourth amendment to the United States Constitution; (b) the Texas Constitution, article I, section 9; and (c) the Texas Code of Criminal Procedure. Johnson points to the general rule that warrantless searches are unreasonable per se. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Fancher v. State*, 659 S.W.2d 836, 839 (Tex. Crim.App.1983). He then acknowledges the exceptions to this rule, but urges that the State's actions do not fall within any of the exceptions.

 The State argues that it had consent. Consent is an exception to the rule that warrantless searches are unreasonable per se. *Schneckloth*, 412 U.S. at 219, 93

---

**6.** Neither the record nor the briefs is clear about exactly what evidence was suppressed. The record indicates, however, that each instance of suppression involved a life insurance policy naming Johnson as a beneficiary.

S.Ct. at 2043–44; *Fancher,* 659 S.W.2d at 839. The State has the burden to prove consent by clear and convincing evidence. *Fancher,* 659 S.W.2d at 839. Consent will be determined from the totality of the circumstances. *Id.* Without findings of fact, we must presume that the trial court made the necessary findings to support its ruling, and we must review the evidence in the light most favorable to the trial court's ruling. This would end the analysis unless the facts at the suppression hearing require that the trial court find consent as a matter of law.

Sergeant Davis testified that other officers arrived at the scene with a video camera and videotaped the stairway, the bedroom, and the other rooms of the house. The State's evidence of consent to search the premises rests on two bases: (1) Sergeant Davis' testimony about communications from Johnson to the police dispatcher and to himself; and (2) communications from the decedent's mother, Mrs. Reuter, to Sergeant Davis.

Sergeant Davis testified that he received a call that a shooting had been reported at the Sweeny Funeral Home. He proceeded immediately to the funeral home, where he met Johnson. Johnson invited him in and led him up the stairs to the living area and into the bedroom where Edwina Prosen's body lay across the bed. Sergeant Davis saw a shotgun leaning against the bed. Johnson told Sergeant Davis that he dropped the shotgun and it fired accidentally. Johnson asked Sergeant Davis to help him get Prosen onto the backboard of the bed so he could get her down the stairs and into the hearse to take her to the hospital. Sergeant Davis told Johnson to leave everything as it was, and he called for an ambulance.

Sergeant Davis testified that he began investigating a "possible homicide" but he acknowledged that it might have been an accidental shooting. He testified that if Johnson's story was correct that the shotgun fired accidentally, then he believed the shotgun presented a danger to himself and to anyone else who might come into the room. He could see that the shotgun contained more shells. He seized the shotgun and secured it in the trunk of his patrol car. In addition, Sergeant Davis testified that Johnson was there when he took the shotgun, shells, and the bedding, and that Johnson said nothing to stop him. Sergeant Davis testified that all these items were in plain view in the bedroom where Johnson had led him. Johnson did not testify at the hearing, but Sergeant Davis testified that Johnson refused to sign a consent to search form at 11:50 p.m. on the night of the killing. This refusal was some 16 hours after Sergeant Davis had arrived in response to Johnson's call and had conducted the initial search.

■ Sergeant Davis testified that he received verbal consent from the decedent's mother, Mrs. Reuter, who also lived on the premises, to "do and take what you have to." Mrs. Reuter lived upstairs where Johnson and Prosen lived. Third persons who have equal control over and use of the premises being searched have authority to consent to the search. *Fancher,* 659 S.W.2d at 839. Mrs. Reuter testified later but neither the State nor defense counsel asked her if she consented to the search. If we assume, without concluding, that Mrs. Reuter had authority to consent to a search of the entire premises, then the question is whether her words to Sergeant Davis actually conveyed such consent.

■ In a suppression hearing, the trial court is the sole finder of fact, and it may choose to believe or disbelieve any or all of the witnesses. *Meek,* 790 S.W.2d at 620. Mrs. Reuter testified at the suppression hearing, but not on this issue. The trial court could have chosen to disbelieve Sergeant Davis's testimony that he received verbal consent from Mrs. Reuter. Or the trial court could have concluded that her consent did not extend beyond the bedroom into the other areas of the building. On the other hand, the trial court could reasonably have believed that, while Mrs. Reuter intended to give Sergeant Davis her consent to search the entire premises, she actually had no authority to consent to such an extensive search. There are several ways in which the trial court could reasonably have found or concluded that Sergeant Davis did not have explicit consent to search the entire premises.

■ Even without explicit consent, the State has the authority in some instances to search the immediate area of a crime under the doctrine of implied consent adopted in *Brown v. State*, 856 S.W.2d 177, 182 (Tex. Crim.App.1993), in which the court held as follows:

> We therefore hold that when a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was *committed by a third person*, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. As long as the individual *is not a suspect in the case* or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible. This implied consent is valid only for the initial investigation conducted at the scene and does not carry over to future visits to the scene.

(Emphasis added.)

The rule in *Brown* requires that the following three factors be satisfied before implied consent to search the premises goes into effect: (1) a person reports "a crime" to the police; (2) the reported crime must be on the reporting person's premises; and (3) the reporting person "either states or suggests that it was committed by a third person...." *Id.* Once these three factors are satisfied, the police have implied consent to search. If any one of these factors is not satisfied, implied consent does not arise.

■ After implied consent has arisen, it may cease by either of two means: (1) the person reporting the crime becomes a suspect, *id.;* or (2) the person reporting the crime takes some action to revoke his consent. *Id.* Once the person reporting the crime becomes a suspect, federal and state constitutions override the doctrine of implied

consent, and any consent to search must be explicit.[7]

■ In this situation, however, when Johnson notified the police of the shooting, he did not report it as a crime committed by a third person, but as an accidental shooting that had occurred at his own hands. Hence, there was no third person perpetrator to identify, and the *Brown* rule of implied consent could not go into effect in the first instance. The police could not investigate this as a crime scene unless they suspected Johnson was lying about the accidental nature of the shooting. If the police thought this, then Johnson was a suspect from the outset, and the *Brown* rule would prohibit, rather than permit, any finding of implied consent. *Id.* The searches would be limited by U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; and TEX.CODE CRIM.P.ANN. art. 1.06 (Vernon 1977).

### 3. Conclusion

The State argues that consent is evident from the following: (1) Johnson's call to the police; (2) Johnson's act of leading Sergeant Davis up the stairs and into the bedroom to Prosen's body; (3) Sergeant Davis's testimony that Mrs. Reuter gave him her verbal consent to "do and take whatever you have to"; and (4) Johnson's failure to object to Sergeant Davis's removal of the shotgun, shells, pillow, pillowcases, and bedding. Evidence of consent must be clear and convincing. *Fancher*, 659 S.W.2d at 839. The trial court could have found that the evidence before it in the suppression hearing did not constitute clear and convincing evidence of consent to search the entire facility.

The trial court could have found from the totality of the circumstances that consent was limited to the items that were in plain view when Johnson led Sergeant Davis into the bedroom, and that neither Johnson nor Mrs. Reuter had consented to a search of the entire premises. If the trial court found that the State conducted the search without con-

---

7. The *Brown* court indicated that implied consent to search is limited to "the routine investigation of the offense and *the identification of the perpetrator.*" 856 S.W.2d at 182 (emphasis added). Once the perpetrator is identified as the premise owner that reported the crime, implied consent ceases and the suspect acquires full constitutional protection. This interpretation is consistent with the phrase: *"As long as the individual is not a suspect...." Id.*

sent (whether express or implied), then the State has failed to show that its actions were within an exception to the general rule against warrantless searches. Therefore, the search beyond the stairs and bedroom was unreasonable and in violation of both the United States and Texas Constitutions. *Fancher*, 659 S.W.2d at 839.

We find that the trial court did not abuse its discretion in suppressing the videotape showing investigation beyond the bedroom and stairs. We also find that the trial court did not abuse its discretion in suppressing any other evidence obtained pursuant to the warrantless search on the day of the shooting.

We overrule the State's point of error one.

## Search 2:
## September 30, 1991;
## search of the hearse *without a warrant.*
### (Relevant to points of error two, three, four, and five)

### 1. Facts

After Edwina Prosen was pronounced dead at Sweeny Community Hospital, her body was taken to the Harris County Medical Examiner for an autopsy. When the medical examiner completed his work, her body was sent to Escort Embalming Service for embalming. On September 30, 1991, Johnson went to Escort Embalming Service, took Prosen's body, and put it in the hearse that he and Prosen had used for the Sweeny Funeral Home business. The title of the hearse was in Prosen's name, and Johnson was a named insured on the hearse auto policy.

Johnson was on Highway 288–B in Angleton, driving the hearse containing Prosen's body, when Deputy David Cisneros of the Brazoria County sheriff's department received a call to look for Johnson in the hearse transporting a body. Deputy Cisneros saw Johnson on the highway and stopped him. Deputy Cisneros testified that it was getting dark (at 7:12 p.m.), and that he used his flashlight to glance inside the hearse as Johnson was getting out of it, but he did not search the hearse.

While Deputy Cisneros was talking with Johnson, standing at the back of the hearse, two more law enforcement officers drove up, Deputy Anderson and Lieutenant Jeff Gillenwaters. Deputy Cisneros testified that Lieutenant Gillenwaters was talking to someone on his car phone, then got out and instructed him "to place Mr. Johnson in custody for investigative hold through Sweeny Police Department. And for—for the theft of this corpse." At that time, Deputy Anderson, also of the Brazoria County sheriff's department, arrested Johnson and transported him to the county jail.

Deputy Cisneros drove the hearse to the sheriff's department patrol office. While he was in the hearse, he made a cursory visual search of the interior, and he saw Prosen's body lying in the back of the hearse. He did not open the glove compartment at this time. When Deputy Cisneros delivered the hearse to the police station, they conducted an inventory search, which yielded, among other things, "some life insurance papers." The trial court granted Johnson's motion to suppress the evidence gained in this inventory search.

### 2. Analysis

In points of error two, three, four, and five, the State asserts the warrantless inventory search of the hearse on September 30, 1991 was legal. In point of error two, the State alleges Johnson has no standing to challenge the search. Points of error three, four, and five contend the search was lawful.

For the State to obtain a reversal of this suppression order, it must show all three of the following: (1) the stop and arrest were lawful (point of error three); (2) the inventory search was in accordance with the United States Constitution (point of error four); and (3) the inventory search was in accordance with the Texas Constitution and the Texas Code of Criminal Procedure (point of error five).

In point of error five, the State asserts that "the arrest and the impoundment are lawful." The State did not obtain any evi-

dence as a result of the stop prior to the arrest. It obtained evidence only in the inventory search that followed the arrest. Thus, the controlling issue is whether the arrest was lawful.

 In point of error two, the State asserts Johnson has no standing to contest the search of the hearse. The hearse belonged to Prosen, not to Johnson. Johnson's fourth amendment right depends upon a subjective expectation of privacy that society is prepared to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Johnson did not own the hearse. At the time of the stop, the hearse's owner of title, Edwina Prosen, was recently deceased. The State argues that title to the hearse vested at her death in her legal heirs, which would be her three children. TEX. PROBATE CODE ANN. §§ 3, 38 (Vernon 1980 & Supp.1995).[8] The owner of title, Edwina Prosen, could not give Johnson consent to drive the hearse after she was deceased. And Johnson produced no evidence that he had received consent from the Prosen heirs to drive the hearse. Thus, the State contends that Johnson could not have held a reasonable expectation of privacy in the hearse.

Johnson did, however, own the business in which the hearse was used—namely, Sweeny Funeral Home.[9] He was a named insured on the hearse insurance policy, which would suggest that the owner of the hearse expected Johnson to drive it. Non-owner occupants of vehicles may have standing to contest searches in some situations. In *Wilson v. State*, 692 S.W.2d 661, 662 (Tex.Crim.App. 1984), the Court held that the appellant had a reasonable expectation of privacy in, and consequent standing to contest the search of, an automobile that he had borrowed. In *State v. Bassano*, 827 S.W.2d 557, 559 (Tex.App.—Corpus Christi 1992, pet. ref'd), the court held that the defendant had standing to contest the search of his wife's vehicle. And in *Chapa v. State*, 729 S.W.2d 723, 729 (Tex.

Crim.App.1987), the Court held that the appellant had a reasonable expectation of privacy in, and consequent standing to contest the search of, the interior of a taxicab in which he was a passenger.

 The trial court could have found that Johnson had a reasonable expectation of privacy in the hearse, despite Edwina Prosen's death the previous day, and despite the pending disposition of Prosen's estate. The reasonableness of this expectation is a question for the finder of fact. At a suppression hearing, that is the trial court. *Meek*, 790 S.W.2d at 620.

 The State raises the issue of standing for the first time on appeal. In the absence of findings of fact and conclusions of law, we must assume that the trial court found the necessary facts to support its ruling. Standing, however, is a question of law, which should be reviewed de novo by the appellate court. Following the analysis above, we hold that Johnson had a reasonable subjective expectation of privacy in the hearse, and, therefore, standing to contest the search.

We overrule point of error two.

After holding that Johnson has standing to contest the search, we must now review the facts surrounding the search itself to determine whether the trial court could have found that the search was unlawful. If the trial court had no evidence before it from which it could reasonably conclude that the search was unlawful, then it abused its discretion in suppressing the evidence.

In point of error three, the State asserts the trial court erred in suppressing the evidence because it was reasonable for Deputy Cisneros to stop Johnson in light of the facts known to Deputy Cisneros at the time. We must determine whether the evidence before the trial court would support a reasonable finding that the stop was *unlawful.*

8. To reach this conclusion, the State depends upon its disputed premise that Johnson and Prosen had not entered into a common-law marriage. As noted above, we need not resolve this issue to determine whether the trial court abused its discretion in suppressing the evidence.

9. Johnson was not a licensed funeral home operator; Edwina Prosen was.

Deputy Cisneros testified that he received a call that Johnson was transporting a "stolen body" in the hearse. This would be a sufficient basis for a reasonable stop. On cross-examination, however, Deputy Cisneros conceded that his report said nothing about the dispatcher informing him that the hearse was transporting a body *illegally*, but simply "transporting a body." The trial court could have believed that the information that Deputy Cisneros had at the time he stopped the hearse was insufficient to make the stop reasonable. If the trial court so found, then it was within its discretion to suppress any evidence obtained as a result.

No evidence was obtained as a result of the stop itself, however, because neither Deputy Cisneros nor any other officer searched the hearse immediately following the stop. The search followed the arrest. Therefore, this Court must consider whether the arrest was valid. The State can legally conduct a search pursuant to a lawful arrest. If the record shows that the arrest was lawful, then the evidence obtained as a result thereof was lawful, and the trial court abused its discretion in suppressing it. On the other hand, if the trial court could reasonably have found that the arrest was unlawful, then it was within its discretion to suppress any evidence obtained as a result.

Deputy Cisneros testified that he and Deputy Anderson arrested Johnson on Lt. Gillenwaters' orders. Neither Deputy Anderson nor Lt. Gillenwaters testified at the suppression hearing. The only testimony concerning the basis for Johnson's arrest came from Deputy Cisneros on cross-examination:

A Then, my patrol lieutenant, Jeff Gillenwaters, showed up. And he was—I don't know who he was talking to on his car phone, but he was talking to somebody on his car phone. At that time, nothing really happened for a couple of minutes.

Q What was going on during that time. Nothing? Nobody was—

A Yeah. We were just standing around.

Q Nobody was looking in the vehicle?

A No. No. Not at that time.

Q Okay.

A We waited. Myself and Mr. Anderson waited with Mr. Johnson, in back of the Cadillac hearse. And until lieutenant finally come out of his car. He got through talking on the phone. He was—we were then told to place Mr. Johnson in custody for investigative hold through Sweeny Police Department. And for—for the theft of this corpse.

Q For the theft of the corpse?

A Right.

Q Okay. All right. So, that was Jeff Gillenwaters telling you those things, the deputy?

A Yes.

Q And he is with the Sheriff's department?

A Yes, sir. He was at the time.

Q Is he an investigator with the Sheriff's Department at the time?

A He was my patrol lieutenant.

Q Patrol lieutenant? Now, after—after you were advised by Jeff Gillenwaters to place him in custody, what did you do?

A I assisted Mr. Anderson, Deputy Anderson in placing the—Mr. Johnson in custody. He was searched and placed in back of the patrol car.

Q All right. Was he handcuffed?

A I don't recollect.

Q You don't recollect?

A I don't recollect, because I didn't actually handcuff him. Mr. Anderson did. And Mr. Anderson put him in back of his patrol car.

. . . .

Q Okay. Do you know what type of offense theft of a corpse is under the Penal Code?

A No, sir. I'm not really familiar with it.

Q Can you tell me why you filled out a misdemeanor miscellaneous report in connection with this incident?

A Why?

Q Yes, sir.

A Because it wasn't pertaining to our department. It was pertaining to the Sweeny Police Department.

Q Well, do you use misdemeanor miscellaneous reports for incidents that arise out of other departments?

A Yes, we do.

Q Well, what was arising out of the other department was the allegation of murder; isn't that correct? Investigative hold for murder?

A No, sir. From the point—I called dispatch, and she told me what was going on in Sweeny, that he was—from what I got out of that conversation was that the—this whole incident was, you know, was occurring from another police department. Not from us.

Q I understand that. But regarding investigative hold for the offense of murder, right?

A Right.

Q If there was a theft of a corpse, that was something that occurred in your presence, because you were there; and *you saw the corpse in his possession, correct?*

A *Right. I don't know where they got their information, but that was what I was told.*

Q Would it be fair to say you didn't have any probable cause at the time to stop and arrest Mr. Johnson for theft of a corpse, did you?

A For the theft of a corpse.

A Yes, sir?

A From the time that I got the phone call, yes, sir, I had—you know, I had reason to believe that he was possibly in possession of a corpse or a body.

Q Well that's not—

A From what I was told by the dispatch office.

MR. STANSBERRY [defense counsel]: I'll object to the response, your Honor.

THE COURT: Sustained.

Q Officer Cisneros, my question is that at the time that you had Mr. Johnson out there at the roadside, you did not have probable cause to arrest him for theft of a corpse, did you?

A That was the reason I stopped him. That he was—that he had illegally or unlawfully obtained a body from Houston and was back in route over here with it. That was my presumption.

MR. STANSBERRY: I'm sorry. I object. It's still not responsive. It's a yes or no question.

THE COURT: Well, I'm going to overrule it, now, as it stands. You may pursue your yes or no, if you'd like, though.

Q Yes or no. You didn't have probable cause?

A Yes. I believe I did.

Q You felt you had probable cause?

A Yes, sir, I did.

Q What was the probable cause?

A The probable cause was due to the impending investigation from Sweeny, and from—and the information that I got. That. Yes. And I thought I was right in stopping that car.

Q Well, you didn't have any details of the information out of Sweeny, did you. You didn't have any details coming from Sweeny at that time, did you?

A No. They just gave me a brief rundown on what happened over there.

(Emphasis added.)

 The "totality of the circumstances" test applies for determining probable cause for warrantless arrests. *Hafford v. State,* 828 S.W.2d 275, 277 (Tex.App.—Fort Worth 1992, pet. ref'd), *cert. denied, Hafford v. Texas,* —— U.S. ——, 113 S.Ct. 1313, 122 L.Ed.2d 700 (1993). Deputy Cisneros did not testify that he stopped Johnson for suspicion of murder. He testified only that he stopped Johnson for illegally transporting a body. His testimony was then undermined when he acknowledged that his report only stated that the dispatcher said "transporting a body" without indicating that the transportation was in violation of the law. The trial court was within its discretion to find that the stop was unreasonable, and that the officers had no probable cause to arrest Johnson. If the trial court so found, it acted within its discretion in granting the motion to

suppress all the evidence obtained from the inventory search of the hearse.

We overrule point of error three.

By overruling point of error three, we hold that the trial court did not abuse its discretion in suppressing the evidence obtained in the warrantless inventory search of the hearse. State's points of error four and five allege that the inventory search was lawful under the United States and Texas constitutions. The inventory search could not be constitutional if it followed an illegal arrest. Because we hold that the trial court could have found the arrest to be unlawful, the State's constitutional arguments must fail.

We overrule points of error four and five.

### 3. Conclusion

To summarize the points of error relating to the warrantless search of the hearse (Search 2), the trial court could have found that the stop and arrest were unlawful. Therefore, it was not an abuse of discretion to suppress the evidence obtained from the inventory search of the hearse.

We overrule points of error two, three, four, and five.

### Search 3:
### October 1, 1991; search of the hearse *with a warrant.*
### (Relevant to Point of Error 6)

### 1. Facts

Following the inventory search of the hearse, the officers obtained a warrant to search the hearse. The next day, October 1, 1991, they searched it again, this time with a warrant. The trial court granted Johnson's motion to suppress the evidence obtained in this search.

### 2. Analysis

 The affidavit that provided the basis for the warrant asserted that life insurance policies were in the hearse, and that these constituted evidence tending to show that Johnson committed murder. Johnson argues that the information in this affidavit was obtained by the unlawful warrantless search

of the hearse. He claims that such information is the "fruit of the poisonous tree." The "fruit of the poisonous tree" doctrine does not apply when knowledge or possession of evidence in question is obtained from a source independent of the government's wrongful act. *Autry v. State,* 626 S.W.2d 758, 764 (Tex.Crim.App.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

 The warrant specifically stipulated that the purpose of the search was to seize life insurance policies. The State alleged that the warrantless inventory search (from the preceding day) indicated that the vehicle contained such life insurance policies. The State alleged no other basis for suspecting that the hearse contained the life insurance policies. The previous day's search provided the information upon which the warrant was based. The other assertions in the warrant do not provide a legal basis for searching the hearse. The State conceded that the warrant search of the hearse was a moot issue after the trial court suppressed the inventory search.

### 3. Conclusion

The testimony allows the trial court to conclude that the warrant search of the hearse violated Johnson's constitutional rights. Although the trial court made no explicit finding to this end, we must presume that the trial court made whatever findings were necessary to support its ruling. The court did not abuse its discretion in suppressing the evidence obtained from the warrant search of the hearse.

We overrule point of error six.

### Search 4:
### October 1–3, 1991;
### Police passively received, from the Prosen family,
### property that the Prosen family took from the funeral home.
### (Relevant to points of error seven, eight, nine, 10, and 11)

### 1. Facts

On October 1 through October 3, 1991, all three sons of the decedent entered the Swee-

ny Funeral Home and removed items belonging to three of their family members: their deceased mother; their maternal grandmother (Mrs. Reuter); and Jeff Prosen, the youngest of the three Prosen sons. The decedent's mother, Mrs. Mary Reuter, had lived at the funeral home for three years. After the shooting, she asked her grandson Robert Prosen to remove her items from the funeral home. The youngest brother, Jeff Prosen, had also lived at the funeral home for years, but he had married and moved out in August 1991, the month before the shooting, without taking all of his belongings.

Robert Prosen testified that among the items they removed were some insurance policies on the decedent. He admitted on cross-examination that they had also removed some documents belonging to Johnson. He further testified that Johnson's attorney, Dean Johnson, was present on the premises of the funeral home on October 2, 1991, while the sons were removing items belonging to their mother, their grandmother, and the youngest son, Jeff Prosen. Robert Prosen testified that he had several conversations with Dean Johnson about ownership of some of the items they were removing. He testified that they left the disputed items in the hallway and photographed them with Dean Johnson's permission. Dean Johnson was there on only one of the three days that the Prosen brothers were removing property from the funeral home.

After the Prosen brothers removed the items, Johnson's attorney, Dean Johnson, filed a burglary complaint against them. Sweeny Police Chief Murphy testified that Dean Johnson's complaint alleged that "[t]here were items missing, that had been there the day before, when he took the pictures."

Robert Prosen testified that when he became aware that Dean Johnson had filed the burglary complaint, he offered to return all the items to Dean Johnson that evening. He testified that Dean Johnson "requested it not be returned to him. So, we gave it to the police."

Chief Murphy testified that: (1) Dean Johnson, appellant's attorney, suggested to him that the police maintain custody of the items that were the subject of the burglary complaint; (2) the Prosens turned over boxes containing thousands of documents, that would fill "the equivalent of eight or 10 file drawers"; and (3) he considered it the duty of the police department to photograph, inventory, and list all of the items that were turned over to them in connection with this burglary charge.

The police presented the burglary complaint to the grand jury, which did not return an indictment against the Prosens. The trial court granted the motion to suppress all the evidence that the Prosens took from the funeral home and delivered to the Sweeny Police Department.

## 2. Analysis

In points of error seven through 11, the State asserts that the trial court erred in suppressing the evidence taken by the Prosen brothers and delivered to the police department. The suppression motion alleged that the search violated Tex.Code Crim. P.Ann. art. 38.23(a) (Vernon Supp.1995), which provides:

(a) No evidence obtained by an officer *or other person* in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

(Emphasis added.)

Johnson argues that when the Prosen brothers took the evidence that they later turned over to the police, they did so in violation of the law. At the suppression hearing, this contention found some support in the testimony of Chief Murphy that Dean Johnson had filed a burglary complaint against the Prosens for taking items from the office that he thought had been there the

day before. In addition, Robert Prosen testified that they entered the funeral home on three consecutive days, but he only testified to Dean Johnson's presence during one of those three days. Robert Prosen also testified that among the documents they took from the funeral home were some of Johnson's personal papers.

From the collective testimony before it at the suppression hearing, and despite the grand jury's failure to issue an indictment, the trial court could have found that the evidence was seized illegally. Although the trial court made no formal findings of fact, it stated its reason for suppressing the evidence that the Prosens delivered to the police. It found that the items were seized unlawfully:

> THE COURT: All right. First of all, I want to speak to the motion to suppress evidence seized by members of the Prosen family: While the entry by members of the Prosen family into the Sweeny Funeral Home may be questionable, the entry could very well be lawful as opposed to unlawful, based upon the evidence before the Court. But it's clear to me that the seizure of Mr. Johnson's property as opposed to that of the deceased and/or the deceased' [sic] mother, was not lawful or proper.
>
> . . . .
>
> And therefore, I don't know from the evidence, what's Mr. Johnson's and what belongs to the estate of Mrs. Prosen or what belongs to the mother of the deceased. And it would seem to me that it's the State's burden to clear that up for me, *but it's clear to me that some of the items that were there in the Sweeny Police Department, in that room, were Mr. Johnson's and were seized unlawfully.*
>
> And therefore, I'm going to grant the motion to suppress the items seized by members of the Prosen family.

(Emphasis added.)

The trial court acted within its discretion in this finding. In point of error seven, however, the State argues that the statute does not apply to the evidence taken by the Prosen brothers, because they are not within the meaning of the term "other person" in the first sentence of the code provision.

Points of error eight, nine, 10, and 11, rest upon our determination of this issue in point of error seven. In points of error eight and nine, the State asserts that the police department's inventory was in accordance with the United States and Texas Constitutions. It will be unnecessary to address the constitutionality of the inventory search if the code provision does not apply to the evidence taken by the Prosens. In points of error 10 and 11, the State asserts that the inventory was in accordance with the United States and Texas Constitutions because the police had Dean Johnson's consent to review the property.

The suppression motion in question here alleged only a single ground: that the evidence was "obtained illegally and in violation of Article 38.23(a) of the Texas Code of Criminal Procedure." The motion does not claim that the police violated either the United States or Texas Constitutions in *receiving* the evidence. The code provision itself incorporates both constitutions as they apply to the act of obtaining evidence. If the evidence was obtained "by an officer *or other person*" in violation of the federal or state constitutions or other federal or state laws, then that evidence cannot be used against the accused. Johnson argues that the violation was the Prosens' alleged illegal entry and the alleged burglary. He does not contend that it was illegal for the police department to *receive* the evidence, but he does argue that it was illegal for the police to *use* the evidence as they did.

██ The State argues that the term "other person" in the statute should apply only to agents of the government, not to all natural persons generally. The State says in its brief, "This is a case of first impression because the Court of Criminal Appeals has never expressly ruled on this issue." This Court has previously construed this statute to apply to private persons. *Weaver v. State*, 721 S.W.2d 495, 498 (Tex.App.—Houston [1st

Dist.] 1986, pet. ref'd).[10] *Weaver,* however, did not turn upon the construction of this code provision and was decided on other grounds.[11] The case before us, on the contrary, does turn upon the construction of this code provision. We hold that the term "other person" in Tex.Code Crim.P.Ann. art. 38.23(a) (Vernon Supp.1995), includes private persons and is not limited to agents of the government.

In the present case, the trial court found that the Prosens violated the law in taking Johnson's property from the funeral home. The statute prevents this property, even though taken by private persons, from being used in evidence against Johnson. *Id.*

We overrule point of error seven.

In points of error eight and nine, the State asserts that its inventory search was in accord with the United States and Texas constitutions. These contentions, however, do not address the ground upon which the motion was granted, namely, that the evidence was obtained in violation of Article 38.23(a). Johnson did not assert that the evidence should be suppressed because the inventory search violated either the United States or Texas Constitutions. Johnson's motion appears to have addressed only the allegedly illegal actions of the Prosen brothers. The only grounds upon which the suppression could be ordered were those specified in the motion. Therefore, points of error eight and nine are inapposite.

We overrule points of error eight and nine.

In points of error 10 and 11, the State claims that the police had the consent of Dean Johnson, Johnson's attorney, to review the property that the Prosens delivered to them. Consent is an exception to the general rule that warrantless searches are unreasonable per se. *Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043; *Fancher,* 659 S.W.2d at 839. In the absence of findings of fact or conclusions of law, this Court must presume that the trial court made whatever findings were necessary to support its rulings.

Dean Johnson testified, but not about whether he consented to the police reviewing the evidence that the Prosens delivered to them. In light of the trial court's verbal finding that the Prosens unlawfully seized the evidence, and its consequent ruling that the evidence was obtained in violation of Article 38.23(a), the consent issue is moot. Consent is an exception to the constitutional protections against unreasonable searches and seizures *by the government. Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043 (1973); *Fancher,* 659 S.W.2d at 839. As discussed above, the code provision goes beyond this constitutional protection and extends to actions by private persons. *Weaver,* 721 S.W.2d at 498. The illegality of the Prosens' act preempts the State's argument that the police had consent to review the evidence delivered by the Prosens. To hold otherwise would mean that a person subjected to a wrongful seizure by a private person could not complain to the police without giving up the very rights that Article 38.23 was designed to protect.

We overrule points of error 10 and 11.

### 3. Conclusion

The trial court did not abuse its discretion in finding that the items belonging to Johnson, which were seized by the Prosen brothers and delivered to the police, were obtained unlawfully. As such, they were inadmissible at trial, and it was proper for the trial court to suppress the evidence.

10. "[I]llegally obtained evidence, *whether procured by private individuals or by police officers,* is strictly inadmissible in Texas criminal proceedings, and our Code thus provides broader *protection than the comparable Fourth Amendment.*" (Emphasis added.)

11. In *Weaver,* a police officer obtained a blood sample from a DWI defendant without his consent, when he was not under arrest, and in the absence of exigent circumstances that would have supported a warrantless search. 721 S.W.2d at 496. Shortly after this blood sample was taken, however, hospital employees obtained a second blood sample without any police involvement. Both blood samples were admitted into evidence. *Id.* at 497. We held that the second blood sample taken by hospital employees did not violate a DWI defendant's rights and was admissible evidence. We concluded that, in view of the admissibility of the second blood sample, any error in taking the first blood sample was harmless. *Id.* at 498. We affirmed the conviction. *Id.* at 500.

We overrule points of error seven, eight, nine, 10, and 11.

## Search 5:
## October 16, 1991:
## search of the funeral home
### *with a warrant.*
### (Relevant to points of error 12 and 13)

### 1. Facts

While the Sweeny Police Department conducted its inventory search of the items delivered by the Prosens, investigator Matt Wingo, from the Brazoria County district attorney's office, also investigated the evidence. Following his investigation, Matt Wingo prepared an affidavit that became the basis for a search warrant for the funeral home. He conducted this warrant search on October 16, 1991. The trial court suppressed the evidence obtained in this warrant search.

### 2. Analysis

The motion to suppress the evidence seized in the (Wingo) warrant search of Sweeny Funeral Home on October 16, 1991, urged that the evidence was obtained in violation of the constitutions of the United States and Texas and of the Code of Criminal Procedure. The trial court based its suppression order on its verbal finding that Investigator Wingo may have viewed unlawfully obtained items to prepare his warrant affidavit:

[THE COURT:] I cannot discern in my own mind, if he reviewed only that property that was taken, seized unlawfully; or did he view the property that was seized lawfully, which would've been the property that belonged to the estate of Mrs. Prosen or the mother of Mrs. Prosen. And Officer Wingo's—Investigator Wingo's testimony is that after reviewing the video and some photographs and some documents or a document, he used some of that to obtain probable cause, as set forth in his affidavit, to obtain the Wingo warrant. And that concerns me greatly.

As to the other matters for which counsel for Mr. Johnson argued I think there are merit with some of them and not merit with others. *But the concern that I have with the inability of me, based upon the evidence before me, to discern whether or not Mr. Wingo, in drawing his affidavit, used items that I say that were obtained unlawfully or seized unlawfully, I'm going to grant the motion to suppress the Wingo warrant.*

(Emphasis added.)

In point of error 12, the State claims that Johnson had no standing to contest the search and seizure on October 16, 1991, because he had conveyed the funeral home two days earlier to his attorney, Dean Johnson. Johnson was in jail at the time of the search. Johnson no longer owned nor occupied the premises. The State concludes that Johnson had no standing to contest the search of a place he neither owned nor occupied. If Johnson had no standing to contest the search, then the trial court erred in granting a suppression motion in his behalf, even if the search was unlawful.

██ Standing to contest a search depends upon whether the defendant has a reasonable, subjective expectation of privacy. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). The earlier analysis of the warrantless search of the hearse also applies here. Johnson's attorney, Dean Johnson, who was the new owner of title to the funeral home, testified that he allowed Johnson to resume using the funeral home as his residence upon his release from jail on October 21, 1991, five days after the warrant search. The trial court could have found that Johnson had a reasonable, subjective expectation of privacy despite the fact that he had conveyed the premises and was occupying a jail cell at the time. If the trial court so found, the suppression was proper.

We overrule point of error 12.

██ In point of error 13, the State asserts the trial court erred because the warrant was valid. The trial court found (as indicated verbally) that the warrant might have been based in part upon unlawfully-obtained evidence. The trial court was within its discretion to find this. *Meek,* 790 S.W.2d at ·620. Suppression is the proper

remedy for evidence that is obtained in violation of the rights of an accused. *Wade v. State,* 814 S.W.2d 763, 764 (Tex.App.—Waco 1991).

We overrule point of error 13.

### 3. Conclusion

The trial court could reasonably have found that Johnson had a reasonable subjective expectation of privacy in the funeral home. He would, therefore, have standing to contest the search. The trial court could reasonably have found that the warrant was based in part upon unlawfully obtained evidence.

We overrule points of error 12 and 13.

To summarize, in 13 points of error, the State has appealed from five orders to suppress evidence. The trial court found, from the evidence before it at the suppression hearing, that the searches were unlawful. As the exclusive fact finder, the court could believe or disbelieve any or all of the testimony from any witness. *Meek,* 790 S.W.2d at 620. Accordingly, we see no abuse of discretion in the court's findings, and suppression was the proper remedy. We hold that Johnson had a reasonable subjective expectation of privacy in both the hearse and the funeral home and, therefore, standing to contest each of the searches. We further hold that TEX. CODE CRIM.PROC.ANN. art. 38.23(a) (Vernon Supp.1995) applies to actions of private persons. We overrule all 13 points of error.

We affirm all five orders to suppress evidence.

COHEN, J., files a concurring opinion.

WILSON, J., files a dissenting opinion.

COHEN, Justice, concurring.

I agree with my colleagues that the trial judge did not err in ordering suppression of what was seized in "search 1" and that appellee had standing to complain about the search of the hearse. Thus, points of error one and two are properly overruled.

Points of error three through five deal with the warrantless inventory search of the hearse. I agree that they should be overruled, but for a different reason than Justice Andell.

I agree with much of Justice Wilson's analysis of these points. Deputy Cisneros' testimony, corroborated as it was by Chief Murphy and by Robert Prosen, provides ample evidence of probable cause to arrest—if it was believed by the trier of fact. There is only one reason the judge could have found no probable cause to arrest, and that is that he did not believe one or more of these three witnesses. If I were the trial judge, I may have reached a different conclusion, as Justice Wilson plainly would have done. But I cannot vote to reverse on this ground without substituting my opinion of the credibility of these witnesses for that of the trial judge.

The trial court is the exclusive finder of fact in a suppression hearing, and thus, it may choose to believe or not believe any or all of any witness's testimony. *Meeks v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App. 1990). This is a powerful legal principle, as this case shows. It means the trier of fact may disbelieve any witness—including relatives of crime victims and unimpeached police officers. This rule applies, of course, to defendants and defense lawyers. *See Messer v. State,* 757 S.W.2d 820, 828 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd) (op. on appellant's mtn. for reh'g) (trial judge did not have to believe defense attorney's unimpeached, corroborated testimony regarding her statements to client).

The trial judge may have considered the absence of testimony from Lt. Gillenwaters important. He may have considered it important that nobody from the Escort Embalming Service testified that Jay Johnson took the decedent's body by force without consent and that no evidence showed Escort Embalming Service, whose agents must have been the victims of and witnesses to that crime, ever reported such an incident to police.

The judge may have doubted that such an event occurred and thus believed that appellee was arrested for a crime that never occurred. *See Vicknair v. State,* 670 S.W.2d 286, 287 (Tex.App.—Houston [1st Dist.] 1984), *aff'd,* 751 S.W.2d 180, 187–88 (Tex. Crim.App.1986) (op. on reh'g). (Police offi-

cer's good faith mistaken belief that crime has occurred does not justify arrest where crime has not, in fact, occurred). The judge may have believed Deputy Cisneros' testimony (set out in the dissenting opinion) that he received a dispatch about a body being transported, instead of Cisneros' earlier testimony about a body having been taken by force and without consent.

The witnesses to the reporting of that event, Robert Prosen and Chief Murphy, were neither neutral nor disinterested. While we may find the cold record of their testimony believable, or even compelling, I cannot escape the fact that a trial judge earns his daily bread by deciding whom to believe and not believe, and we have little authority to second guess those credibility choices. To me, at least, that is what the hundreds of cases like *Meek* and *Messer* really mean.

Finally, even if the arrest was proper, the warrantless inventory search of a closed container in a vehicle has been held to violate art. I, of § 9 of the Texas Constitution. *Autran v. State*, 887 S.W.2d 31, 41–42 (Tex. Crim.App.1994). The trial judge's ruling preceded *Autran*, but may have anticipated it. It is unclear exactly what evidence was seized from what location in the inventory search, but the burden of proving the legality of a warrantless search is on the State.

Under this record and for all of these reasons, I am not convinced that the trial judge abused his discretion. Thus, I concur in the decision to overrule points of error three through five.

I concur separately in points of error ten and eleven, regarding whether appellee's attorney, Dean Johnson, consented to the police viewing the property seized by the Prosens. I do not agree with Justice Andell that the consent issue is moot or that consent is not an exception under art. 38.23(a) to the illegal seizure of property by a private person. I believe that consent is an exception to the art. 38.23 protections against illegal seizures, whether conducted by "an officer or other person." Nevertheless, I would hold

there was no consent here because appellee never consented to the Prosens' seizure.

Article 38.23 is probably the broadest exclusionary rule in the country, and it has existed since 1925, 36 years before *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It prohibits the use in a criminal trial of evidence illegally seized by a private person. Here, the judge found that private persons obtained the evidence illegally.

What is the purpose of having a statute like art. 38.23 apply to a private person? It could only be to keep a private person from doing what the government cannot do and to keep the government from benefitting from the private illegality. The State cannot use evidence acquired by means of burglary or theft; therefore, the State should not be able to do indirectly what it cannot do directly, i.e., to use evidence provided by a private person who acquired it by burglary or theft. This is similar to the "silver platter" doctrine. That doctrine formerly allowed state authorities, who were then not governed by an exclusionary rule, to obtain evidence illegally and deliver it to federal authorities for use in federal prosecutions, so long as the federal agents did not participate in the illegal search but simply received the illegally seized evidence on a "silver platter." This doctrine was abolished nationally in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Article 38.23 abolished it decades earlier in Texas. We should not reinstate it here.

The trial judge could have reasonably concluded that neither Dean Johnson nor appellee consented to the police *examining* the stolen documents. If the evidence showed conclusively that either appellee, personally, or Dean Johnson, acting with appellee's authority, had consented to such an examination, I would agree with Justice Wilson that such a consent waived any rights under art. 38.23. As far as I can determine, Dean Johnson never consented to the police examining these documents.[1] The trial judge could have concluded that it was not neces-

---

1. Constitutional rights are personal to each individual. If Dean Johnson had consented to the examination of the documents, there would still be the issue of his authority to waive appellee's rights.

sary for the police to examine appellee's papers, either in order to return them to him or to prosecute anyone for their illegal seizure. The judge could have concluded that far from consenting to the Prosens' seizure, Dean Johnson objected to it, sought their prosecution on account of it, and desired the return of the items without having to confront them in person, and therefore, the State should not benefit from that illegality. The officers' examination of these papers was the involuntary consequence of the Prosens' illegal seizure. *Of course, complaining about a theft will inevitably entail exposing to the police* (at least to a limited degree) the stolen property. But if a person must choose between doing nothing and allowing an illegal seizure by a private citizen to go unpunished or waiving the right to privacy by complaining of the crime to police, then art. 38.23 really gives no protection against private seizures. The silver platter doctrine would be reborn.

It is significant that we are construing a statute here, not interpreting judge-made common law. The Texas Legislature has declared the public policy of this state to be that illegal seizures by private persons are wrong. Because such seizures are wrong, property owners should be able to complain to police about them without giving up the very privacy rights that art. 38.23 was designed to protect.

WILSON, Justice, dissenting.

I respectfully dissent.

The majority observes that the entire inquiry is over with our presumption that the trial court found whatever facts were needed to support its ruling, unless the record shows either of the following: (1) that the evidence at the suppression hearing would not support any reasonable finding that the searches were unlawful; or (2) the evidence clearly and convincingly shows that suppression was erroneous as a matter of law. It is true that the trial court is the exclusive finder of fact in a suppression hearing and may choose to believe or disbelieve any or all of a witness's testimony. *Meek v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App.1990). However, if appellate review for abuse of discretion is to be a meaningful exercise, we must be free to reverse those suppression orders that are based on findings contrary to all the evidence presented in the hearing, or upon erroneous legal conclusion based on uncontroverted facts.

I would conclude from the analysis below that the legal conclusions made by the trial judge from uncontroverted evidence would not support the trial court's findings that searches two, three, four and five were unlawful. I would reverse the corresponding suppression orders.

I agree with the majority that search one, the warrantless search of the Sweeny Funeral Home on the day of the shooting, was unlawful. I would, therefore, affirm point of error one and the corresponding suppression order.

### Search 2:
### September 30, 1991;
### search of the hearse *without a warrant.*
### (Relevant to points of error two,
### three, four, and five)

When Deputy Cisneros stopped Johnson on Highway 288–B in Angleton, he testified he did so because of information that Johnson was illegally transporting a body. While Deputy Cisneros was talking with Johnson, standing at the back of the hearse, two more law enforcement officers drove up: Deputy Anderson and Lieutenant Jeff Gillenwaters. Deputy Cisneros testified that Lieutenant Gillenwaters was talking to someone on his car phone, then got out and instructed him "to place Mr. Johnson in custody for investigative hold through Sweeny Police Department. And for—for the theft of this corpse." At that time, Deputy Anderson, also of the Brazoria County sheriff's department, arrested Johnson and transported him to the county jail.

Deputy Cisneros drove the hearse to the sheriff's department patrol office. While he was in the hearse, he made a cursory visual search of the interior, and he saw Prosen's body lying in the back of the hearse. He did not open the glove compartment at this time. When Deputy Cisneros delivered the hearse to the police station, they conducted an in-

ventory search, which yielded, among other things, "some life insurance papers." The trial court granted Johnson's motion to suppress the evidence gained in this inventory search.

In points of error two, three, four, and five, the State asserts the trial court erred in suppressing evidence obtained from the warrantless inventory search of the hearse on September 30, 1991. The motion to suppress alleged that the search was in violation of the following: (a) the fourth amendment of the United States Constitution; (b) article I, section 9 of the Texas Constitution; and (c) the Texas Code of Criminal Procedure.

In point of error two, the State alleges Johnson has no standing to challenge the search. I agree with the majority's analysis of Johnson's standing and its conclusion that Johnson could indeed contest the search.

My analysis requires the following observation at this point: The State asserts in point of error three that the *stop* was lawful, but it does not address the legality of the *arrest* under that point. Nor does the State assert under point of error four that the arrest was lawful. In its argument under point of error five, the State asserts that "the arrest and the impoundment are lawful." The distinction between the stop and the arrest is important to both the legal and the factual analyses. The State did not obtain any evidence as a result of the stop prior to the arrest. It obtained evidence in the inventory search that followed the arrest. In reviewing the order on this motion to suppress, it is essential to determine whether the arrest was lawful.

Deputy Cisneros testified that he received a call that Johnson was transporting a "stolen body" in the hearse. If Deputy Cisneros had information that Johnson was suspected of transporting a "stolen body," or "illegally transporting a body," then this would be a reasonable basis for the stop. On direct examination, Deputy Cisneros testified as follows:

Q How is it that you happened to come into contact with the defendant?

A On that day, I got a call on some information that a subject driving a black Cadillac hearse was possibly back in route through the Angleton area, with a—and possibly, in possession of a *stolen body*.

Q I'm sorry. A stolen what?

A *A stolen body, corpse.*

. . . .

Q Did you spot a Cadillac hearse?

A Yes, I did, sir.

Q Did you stop that Cadillac?

A Yes, I did.

Q And can you tell us who was driving the hearse?

A The driver was identified as Jay Johnson.

. . . .

Q Did you prepare a report about your stopping those—the vehicle stop of the defendant?

A Yes, sir, I did.

(Emphasis added.)

On cross-examination, however, Deputy Cisneros conceded that his written report said nothing about the dispatcher informing him that the hearse was transporting a body *illegally*, but simply "transporting a body":

Q Now, the information—so you contacted dispatch, and they advised you what?

A They advised me to be on the lookout for a subject driving a black Cadillac hearse that's possibly in route from— through the Angleton area, from Houston.

Q And for what reason were you to keep a lookout for that?

A For the sole reason of trying to get him stopped due to him possibly having a *stolen body* in the back of it.

Q Okay. Now, that's not what your report says, is it?

A No, sir.

Q Your report says that you were advised to watch for Jay Johnson driving a black Cadillac hearse which was *transporting a body*; isn't that correct?

A Right. Right.

Q There's nothing against the law about *transporting a body*, to your knowledge, is there?

A No, sir.

Q But that's what your report says?

A Yes, sir.

. . . .

Q Was there any other offenses that you observed to be committed by Jay Johnson or the vehicle prior to the time that you made the stop?

A Prior to the time I made the stop.

Q Yes, sir?

A The information I got through my dispatcher was that the—that due to the circumstances of the investigation of why I stopped him, of the investigation going on in Sweeny, that's why he was stopped. Yes.

Q Because of the investigation. But for no other reason?

A Right. No other reason besides that.

Q No other offense was committed in your presence, right?

A Right.

Q Were you told of any other offenses other than the transportation of the body?

A I was just told of the investigation that was going on in Sweeny at that time.

Q The homicide investigation?

A Yes, sir.

Q Were you told to arrest Mr. Johnson at that time, for the offense of murder?

A Prior to the stop, no I was not told to arrest him.

Q Okay. Were you told to arrest him for any reason at the time you made the stop?

A No, sir.

Q You were just asked to stop him; is that correct?

A Yes, sir.

Q Was there anything else communicated to you, other than just to stop him?

A No, sir.

. . . .

Q Did you tell him he was under investigation for suspicion of transporting a body?

A Right.

Q Or stealing a body?

A Right.

Q What did you tell him. Stealing or transporting?

A *Stealing a body.*

Q Stealing a body?

A Right. Or—I didn't actually say the word stealing a body. I said that the body was *illegally obtained* from somewhere in Houston.

Q Okay. Your information was, it was illegally obtained?

A Right.

Q And why does your report say transported?

A Because the body was in the back of a car.

Q Well in other words, your testimony, here, today, was that your information *you received by dispatch was of a stolen body.* But your report doesn't say anything about a stolen body in it, does it?

A No, it does not.

Q And why is that?

A Because at the time the—the dispatcher told me that she—from what I recall, my phone conversation was due to the investigation in Sweeny. They were asking me to stop the car, to identify the driver Jay Johnson, if he was in that car, and to see if that body was—was in back of his car.

Q Well—

A And that's why I'm saying transporting a body, because, you know, I figured that if he's in a black hearse, he's transporting a body in the back.

Q Well, it's not unusual to see cars going up and down the highway, hearses going up and down the highway carrying bodies, is it? You've seen that many times, have you not?

A Sure. Sure.

Q Specifically, what was the dispatch to you? Was it about a body being transported?

A Body being transported.

Q Body being transported. There was nothing about it being stolen, was it?

A Right. No, sir, it was not. It was not.

. . . .

Q Let me back you up. You told him why you stopped him. Did you tell him you stopped him because you had a dispatch that he was transporting a body?

A Right. Right.

Q Nothing about a stolen body, but he was just transporting a body?

A Right.

Q And then, another deputy showed up. Is that correct?

A Right.

(Emphasis added.)

As the above excerpt shows, Deputy Cisneros conceded that the dispatcher had not actually used the word "stolen" in reference to Edwina Prosen's body. However, in addition to Cisneros' testimony, Chief Murphy testified (on cross-examination) that Robert Prosen came to the Sweeny Police Department after 6:00 p.m. on September 30, and reported that "the body had been removed from the funeral home, *by force* [.]" Chief Murphy testified that he then called the Brazoria County Sheriff's Office and informed them as follows:

A I advised them that I had information that the body had been taken from the funeral home without permission of the family and had been *taken by force,* was in the funeral home hearse, and probably headed back towards Sweeny and that Jeffrey Prosen, the son of the deceased, had gone to meet with Mr. Johnson. And it was possible that one or both parties were armed. And we feared a conflict, should they meet.

Q Okay. Well, there was nothing, then, that was communicated to the Sheriff's Department, the body was, indeed, stolen, was there?

A It was *taken without permission.* And it was *taken by force.*

Q All right. That's what you communicated to the Sheriff's Department.

A I'm not sure I used the word that actual theft had occurred.

Q Okay. And that was all based on information that was related to you by Robert Prosen?

A Yes.

. . . .

Q So, you asked the Sheriff's Department to try to stop Mr. Johnson; is that correct?

A Yes.

(Emphasis added.)

The trial court also had before it the source of Chief Murphy's information, Robert Prosen, who testified on direct examination as follows:

Q Did you, at any time, designate Jay Johnson as one person that would be able to pick up your mother's body?

A No. In fact, I specifically stated that he was not.

. . . .

Q Would you tell us what you told them [Escort Embalming Service]?

A Yes. I spoke with a fellow named Fred Allen, I believe, on the night of the 29th of September. And in that discussion, we—it was very clearly stated that I was the executor of the estate, son of Edwina Prosen and was responsible for my mother and didn't want her body released to anybody but myself or my two brothers.

On cross-examination, he repeated this assertion that he had informed the Sweeny Police that his mother's body had been taken from Escort Embalming Service by force and without authorization:

Q Did you report or call the police and tell anyone at the police agency that your mother's body had been *stolen?*

A I did talk to the Sweeny Police Department.

. . . .

Q Was that after your mom's body had been removed from Escort Embalming?

A Before and after.

Q Well, tell me just about after. Who did you talk to, first of all?

A The chief of police.

Q And what did you tell or say to the chief of police?

A At that time, I was informed that *my mother's body had been taken, without my authority.* And I asked the chief if there was something that could be done to secure her, because I was responsible for her. The family.

Q Did you tell Chief Murphy that someone had overpowered the attendants at the funeral home and taken the body *by force?*

A I believe that. Yes. I believe I told—

Q You told that to Chief Murphy. I'm not asking you what you were told. I'm asking you what you told Chief Murphy. What did you tell him?

A I believe I told him that.

Q You told him that someone had *overpowered* some attendant or someone at Escort Embalming and taken you mom's body *by force?*

A No someone. Jay Johnson.

(Emphasis added.)

Most of defense counsel's cross-examination, other than the excerpts above, focused on the accuracy of Robert Prosen's assertions and beliefs about: (1) the alleged forceful, unauthorized taking of his mother's body; (2) whether Edwina Prosen and Jay Johnson might have entered into a common-law marriage without Robert Prosen's knowledge; and (3) whether Robert Prosen was actually the executor of his mother's estate at that moment. Defense counsel was evidently attempting to show that Robert Prosen was mistaken about the legality of Jay Johnson's removal of Edwina Prosen's body. This issue, however, does not address the legality of the stop. The stop is lawful if it is *reasonable,* even if the police ultimately are proven to be mistaken on their legal presumptions.

The trial court took judicial notice of TEX. HEALTH & SAFETY CODE ANN. § 711.002 (Vernon 1992), which covers the disposition of remains and the duty to inter. It provides, in pertinent part, as follows:

(a) Unless a decedent has left other directions for the disposition of the decedent's remains, *the following persons, in the priority listed, have the right to control the disposition, including cremation, of the person's remains,* shall inter the remains, and are liable for the reasonable cost of interment:

(1) the decedent's surviving spouse;

(2) the decedent's surviving adult children;

. . . .

(b) A person listed in Subsection (a) has the right, duty, and liability provided by that subsection only if there is no person in a priority listed before the person.

(Emphasis added.)

As this code section indicates, a decedent's spouse has priority over adult children in the right to dispose of remains. If Jay Johnson had in fact entered into a common-law marriage with Edwina Prosen, then he had the right under section 711.002 to remove her remains from Escort Embalming Service. This does not, however, address the reasonableness of the stop. The police could have been mistaken about Jay Johnson's right to remove Edwina Prosen's remains, but such a mistake would not make the stop unreasonable.

We do not know if the trial court found a common-law marriage between Johnson and Prosen. Such a finding would be irrelevant, however, to determining the legality of the stop. If the trial court based its suppression order on finding a common-law marriage, this was error, regardless of whether a common-law marriage actually existed. All that matters here is whether Deputy Cisneros had *reason to believe that Jay Johnson was transporting a stolen body and the facts are undisputed on that point.* He testified that he received a dispatch to that effect, and Chief Murphy testified that this was what he had told the sheriff's office.

With the evidence before it, the trial court could *only* have found that Deputy Cisneros had reason to stop Jay Johnson in the hearse. If the trial court based its suppression order on a legal conclusion that the stop was unreasonable given the undisputed facts, this was error. The information before the trial court could not support a reasonable finding that the stop was unlawful. I would conclude that the stop was reasonable as a matter of law under these facts. But this does not yet reach the suppression of any evidence, as the continuing analysis shows.

No evidence was obtained as a result of the stop itself, because neither Deputy Cisneros nor any other officer searched the hearse immediately following the stop. The search followed the arrest. Therefore, we must consider whether the *arrest* was valid. The State can legally conduct a search pursuant to a lawful arrest. *United States v. Robinson*, 414 U.S. 218, 234, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973); *Carrasco v. State*, 713 S.W.2d 120, 122 (Tex.Crim.App.1986). If the record shows that the arrest was lawful, then the evidence from the inventory search was obtained lawfully, and the trial court abused its discretion in suppressing it. On the other hand, if the trial court could legally conclude the arrest was unlawful under the facts, then suppression was proper. *Wade*, 814 S.W.2d at 764.

Deputy Cisneros testified that he and Deputy Anderson arrested Johnson on Lieutenant Gillenwaters' orders.[1] Neither Deputy Anderson nor Lieutenant Gillenwaters testified at the suppression hearing. The only testimony concerning the basis for Johnson's arrest came from Deputy Cisneros on cross-examination. Deputy Cisneros testified that he thought he had probable cause to arrest Johnson for transporting a body that Johnson had obtained illegally. This was the same reason he gave for stopping Johnson. He did not testify that he arrested Johnson for suspicion of murder.

The "totality of the circumstances" test applies for determining probable cause for warrantless arrests. *Hafford v. State*, 828 S.W.2d 275, 277 (Tex.App.—Fort Worth 1992, pet. ref'd), *cert. denied, Hafford v. Tex-*

*as*, — U.S. —, 113 S.Ct. 1313, 122 L.Ed.2d 700 (1993). Deputy Cisneros did not testify that he stopped Johnson for suspicion of murder. He testified only that he stopped Johnson for illegally transporting a body. His testimony was later undermined when he acknowledged that his report only stated that the dispatcher said "transporting a body" without specifically stating that the transportation was in violation of the law.

Having already concluded that the stop was reasonable, I turn to whether the officers had probable cause to arrest Johnson. If the trial court could reasonably have found that the officers had no probable cause to *arrest* Johnson, then suppression was proper. *Wade*, 814 S.W.2d at 764. This is true regardless of the trial court's implicit finding on the legality of the stop. For suppression to be proper, we must conclude that the trial court found that the officers had no probable cause to arrest Johnson.

In light of the "totality of the circumstances" set forth above, *Hafford*, 828 S.W.2d at 277, we must consider Deputy Cisneros's testimony about the arrest. Direct examination:

Q Did you subsequently place Mr. Johnson in custody?

A Yes, sir, he was.

Q He was placed in custody?

A Yes, sir.

Q By you?

A No. Not by me.

Q Who placed Mr. Johnson in custody?

A I believe it was Deputy Anderson.

Q Okay. Did you transport Mr. Johnson?

A No, I did not.

Cross-examination:

Q What happened, then? What happened, next?

A Then, my patrol lieutenant, Jeff Gillenwaters, showed up. And he was—I don't know who he was talking to on his car phone, but he was talking to somebody on his car phone. At that time,

---

1. Hearsay is admissible in a suppression hearing to determine probable cause for an arrest.

nothing really happened for a couple of minutes.

Q What was going on during that time. Nothing? Nobody was—

A Yeah. We were just standing around.

Q Nobody was looking in the vehicle?

A No. No. Not at that time.

Q Okay.

A We waited. Myself and Mr. Anderson waited with Mr. Johnson, in back of the Cadillac hearse. And until lieutenant finally come out of his car. He got through talking on the phone. He was—we were then told to place Mr. Johnson in custody for investigative hold through Sweeny Police Department. And for—for the *theft of this corpse.*

Q For the theft of the corpse?

A Right.

Q Okay. All right. So, that was Jeff Gillenwaters telling you those things, the deputy?

A Yes.

Q And he is with the Sheriff's department?

A Yes, sir. He was at the time.

Q Is he an investigator with the Sheriff's Department at the time?

A He was my patrol lieutenant.

Q Patrol lieutenant? Now, after—after you were advised by Jeff Gillenwaters to place him in custody, what did you do?

A I assisted Mr. Anderson, Deputy Anderson in placing the—Mr. Johnson in custody. He was searched and placed in back of the patrol car.

. . . .

Q Can you tell me why you filled out a misdemeanor miscellaneous report in connection with this incident?

A Why.

Q Yes, sir?

A Because it wasn't pertaining to our department. It was pertaining to the Sweeny Police Department.

Q Well, do you use misdemeanor miscellaneous reports for incidents that arise out of other departments?

A Yes, we do.

Q Well, what was arising out of the other department was the allegation of murder; isn't that correct? Investigative hold for murder?

A No, sir. From the point—I called dispatch, and she told me what was going on in Sweeny, that he was—from what I got out of that conversation was that the—this whole incident was, you know, was occurring from another police department. Not from us.

Q I understand that. But regarding investigative hold for the offense of murder, right?

A Right.

Q If there was a theft of a corpse, that was something that occurred in your presence, because you were there; and you saw the corpse in his possession, correct?

A Right. I don't know where they got their information, but that was what I was told.

Q Would it be fair to say you didn't have any probable cause at the time to stop and arrest Mr. Johnson for theft of a corpse, did you?

A For the theft of a corpse.

Q Yes, sir?

A From the time that I got the phone call, yes, sir, I had—you know, I had reason to believe that he was possibly in possession of a corpse or a body.

Q Well that's no—

A From what I was told by the dispatch office.

[DEFENSE COUNSEL]: I'll object to the response, your Honor.

THE COURT: Sustained.

Q Officer Cisneros, my question is that at the time that you had Mr. Johnson out there at the roadside, you did not have probable cause to arrest him for theft of a corpse, did you?

A That was the reason I stopped him. That he was—that he had illegally or unlawfully obtained a body from Houston and was back in route over here with it. That was my presumption.

[DEFENSE COUNSEL]: I'm sorry. I object. It's still not responsive. It's a yes or no question.

THE COURT: Well, I'm going to overrule it, now, as it stands. You may pursue your yes or no, if you'd like, though.

Q Yes or no. You didn't have probable cause?

A Yes, I believe I did.

Q You felt you had probable cause?

A Yes, sir, I did.

Q What was the probable cause?

A The probable cause was due to the impending investigation from Sweeny, and from—and the information that I got. That. Yes. And I thought I was right in stopping that car.

Q Well, you didn't have any details of the information out of Sweeny, did you. You didn't have any details coming from Sweeny at that time, did you?

A No. They just gave me a brief rundown on what happened over there.

Q And the only other information you had was that according to someone, that Mr. Johnson had overpowered somebody at the embalmer and had taken a body, correct?

A Not that he had overpowered anybody, but from what—

Q So, you didn't even know that at the time, did you?

A Right.

Q Okay. All you knew was that he was—you were told by dispatch, I believe your testimony is, was that he is transporting a body?

A Yes, sir.

Q And that you were asked to stop him?

A *Unlawfully transporting a body.*

Q And you were asked to stop him?

A Yes, sir, I was.

Q That's all the information you really had at that time?

A That's all the information I really had at that time.

Q When you got the vehicle back to the Sheriff's Department, what did you then do?

A Back behind the patrol office, I got out of the car. I waited for [L]ieutenant Gillenwaters to arrive at that time. We contacted our I.D. Division to come photograph the vehicle, and then, I conducted an inventory.

(Emphasis added.)

Under the most arduous cross-examination, Deputy Cisneros maintained that he *stopped* Johnson for *"[u]nlawfully transporting a body* [,]" and that he *arrested* Johnson on the orders of Lieutenant Gillenwaters *"for the theft of this corpse."* Deputy Cisneros testified that immediately prior to Lieutenant Gillenwaters' instructions to place Johnson in custody, Gillenwaters had been on the phone in his police car. Although Gillenwaters did not testify, Chief Murphy testified that he had called the Sheriff's office to ask them to stop Johnson for transporting a stolen body. Chief Murphy placed this call after Robert Prosen came in to his office, which he testified was "After 6:00. 6:00, 7:00 o'clock, probably." Johnson was stopped at approximately 7:12 p.m. and placed in custody approximately 20 to 30 minutes later. The unchallenged facts, taken in their totality, indicate that the officers had probable cause to arrest Johnson. Because I believe the trial court based its decision upon a misapplication of legal principles to undisputed facts, rather than the finding of a material fact at variance with the State's position, I would find the trial court abused its discretion.

I would sustain point of error three.

In points of error four and five, the State asserts that the warrantless inventory search of the hearse was lawful under the United States and Texas Constitutions. This is correct. The police are authorized to conduct an inventory search of a suspect's vehicle following a lawful arrest. *Illinois v. Lafayette,* 462 U.S. 640, 643–44, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); *Gauldin v. State,* 683 S.W.2d 411, 414 (Tex.Crim.App.1984).

I would sustain points of error four and five.

To summarize the points of error relating to the warrantless search of the hearse (Search 2), the trial court *could not reasonably have found* that the stop and arrest were unlawful. By sustaining points of error three, four and five, I would hold that the trial court abused its discretion in suppressing the evidence obtained in the warrantless inventory search of the hearse.

In review, I agree that Johnson did have standing to contest the search. I would, however, sustain points of error three, four, and five, and hold that the stop, the arrest, and the inventory search were lawful.

### Search 3:
### October 1, 1991; search of the
### hearse *with a warrant.*
### (Relevant to Point of Error 6)

On October 1, 1991, the day after Johnson's arrest and the inventory search of the hearse, the officers searched the hearse again, this time with a warrant. The trial court granted Johnson's motion to suppress the evidence obtained in this search. The warrant was based upon the findings from the preceding day's inventory search, and it specifically stated that the purpose was to seize life insurance policies. I have concluded above that the trial court abused its discretion in finding the warrantless search of the hearse to be unlawful and in suppressing the evidence gained as a result.

The testimony requires the trial court to conclude that the warrant search of the hearse did not violate Johnson's constitutional rights. We must presume that the trial court found that the warrant to search the hearse rested upon the "fruit of the poisonous tree"—the evidence gained from the previous day's warrantless search. Such a finding, and the resultant order suppressing the evidence obtained from the search of the hearse with the warrant, constituted an abuse of discretion. Therefore, the trial court erred in suppressing the evidence obtained from the warrant search of the hearse.

I would sustain point of error six.

### Search 4:
### October 1–3, 1991;
### Police passively received, from
### the Prosen family,
### property that the Prosen family
### took from the funeral home.
### (Relevant to points of error seven,
### eight, nine, 10, and 11)

When Robert Prosen learned that Dean Johnson had filed the burglary complaint against the Prosen brothers, he offered to return all the items to Dean Johnson. However, Dean Johnson, who was Jay Johnson's attorney, instructed Robert Prosen not to return the items to him and Prosen handed them over to the police. Dean Johnson asked the police to maintain custody of the items that the Prosens had removed from the funeral home. Chief Murphy testified that the Prosens turned over boxes containing thousands of documents that were the subject of the burglary complaint. He further testified that he considered it the duty of the police department to photograph, inventory, and list all of the items that were turned over to them in connection with this burglary charge. The trial court granted the motion to suppress all the evidence that the Prosens took from the funeral home and delivered to the Sweeny Police Department.

The majority holds that TEX.CODE CRIM. P.ANN. art. 38.23(a) (Vernon Supp.1995), prevents the State from using against Johnson any of the documents that were unlawfully taken by the Prosens. I agree that the statute applies to the actions of private persons and is not limited to government agents. I also agree that the trial court did not abuse its discretion in finding that some of the items were taken unlawfully by the Prosens, thus triggering article 38.23(a). Hence, I agree with the majority's decision to overrule point of error seven. I part company with the majority, however, in determining the effect of Dean Johnson's instructions to both Robert Prosen and the Chief Murphy.

The majority states that the trial court could have found that Dean Johnson never consented for the police to review the evidence that the Prosens took. The evidence at the suppression hearing will not support

such a finding. Dean Johnson complained that the Prosens had taken Jay Johnson's property illegally. Dean Johnson then declined Robert Prosen's offer to return whatever they had taken, and the Prosens, knowing that the items were the subject of Dean Johnson's burglary complaint, turned everything over to the police. Dean Johnson did not testify about whether he consented to the police reviewing the evidence that the Prosens delivered to them. The trial court had to base its finding on the testimony of Chief Murphy. Chief Murphy testified that Dean Johnson then asked the police to maintain custody. These actions constituted Dean Johnson's consent for the police to inventory the evidence that the Prosens took from the funeral home.

Johnson does not contend that it was illegal for the police department to *receive* the evidence, but he does argue that it was illegal for the police to *use* the evidence as they did. This is not persuasive. Dean Johnson, as Jay Johnson's attorney, consented to such review on Jay Johnson's behalf. Consent is an exception to the general rule that warrantless searches are unreasonable per se. *Schneckloth v. Bustamante,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Fancher v. State,* 659 S.W.2d 836, 839 (Tex.Crim.App.1983).

Even though the trial court was within its discretion to find that some of the items had been taken illegally, the State had Johnson's consent to review and inventory the evidence that the Prosens took from the funeral home over October 1 through October 3, 1991. Johnson's consent operated to waive any complaint under Article 38.23(a). The court abused its discretion in suppressing evidence for which Johnson had consented to police custody and review.

I would sustain points of error eight, nine, 10, and 11.

### Search 5:
### October 16, 1991:
### search of the funeral home
### *with a warrant.*
### (Relevant to points of error 12 and 13)

The final search of the funeral home was conducted under a warrant that was based on information obtained in the inventory of the evidence that the Prosens had delivered to the police. I agree with the majority's determination that Johnson had a reasonable, subjective expectation of privacy in the funeral home on the date of search number five. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Hence, Johnson had standing to contest this search and I agree with the decision to overrule point of error 12.

I disagree with the majority's determination that the trial court could have found the Wingo warrant to be invalid. The validity of the warrant turns upon the legality of police inventory of the items delivered to them by the Prosens. I have concluded above that Dean Johnson, and by extension, Jay Johnson, consented to the police custody and inventory of everything taken by the Prosens over the three days from October 1 through October 3. The Wingo warrant was based upon documents to which the State had legal access. The warrant was valid and the October 16, 1991, search of the funeral home was valid. The trial court abused its discretion in suppressing evidence seized from the funeral home under a valid warrant.

I would sustain point of error 13.

### Summary and Conclusion

To summarize, in 13 points of error, the State has appealed from five orders to suppress evidence. The trial court found, from the evidence before it at the suppression hearing, that the searches were unlawful. The majority sees no abuse of discretion in any of the five suppression orders. I disagree with the majority on four of the five. I would hold that the trial court abused its discretion by finding searches two, three, four, and five to be unlawful when the evidence at the suppression hearing will not support such findings.

I join the majority in overruling point of error one, pertaining to the suppression of the videotape from search one. Hence, I would sustain that suppression order. I also

join the majority in overruling points of error two and 12, challenging Johnson's standing to contest the searches of the hearse and the funeral home. I also join the majority in overruling point of error seven, addressing the meaning of the term "other person" in Article 38.23(a).

I part company with the majority on the legality of the remaining searches. I would sustain points of error three, four, five, six, eight, nine, 10, 11, and 13. I would hold that the trial court abused its discretion in suppressing the evidence obtained from searches two, three, four, and five: i.e., the inventory search of the hearse without a warrant; the following search of the hearse with a warrant; the search of the items that the Prosens delivered to the police; and the search of the funeral home under the Wingo warrant.

Accordingly, I would reverse those four suppression orders. I would affirm in part and reverse and remand in part.

