IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NOS. PD-1019-06 & 1047-06






LAWRENCE PRESTON MILES, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


HARRIS COUNTY






 Cochran, J., delivered the opinion of the Court in which Meyers, Womack,
Keasler, Hervey and Holcomb, JJ., joined. Price, J., filed a concurring opinion
in which Johnson, J., joined. Keller, P.J., concurs.


O P I N I O N 


 

 A tow-truck driver made a citizen's arrest of appellant for DWI after pursuing him
through busy Houston streets late one night. Appellant was then charged with DWI and
unlawfully carrying a weapon. He filed a motion to suppress under Article 38.23, the Texas
exclusionary statute, (1) and claimed that evidence obtained as a result of this citizen's arrest
should have been excluded because the tow-truck driver violated traffic laws when he pursued
appellant. After the trial court denied the motion to suppress, appellant pleaded guilty and
appealed the trial court's suppression ruling. The court of appeals affirmed the trial court's
ruling. It concluded that laws regulating the flow of traffic do not fall within the category of
"laws" implicated by Article 38.23 because those laws do not exist to regulate the acquisition
of evidence to be used in a criminal case. (2) We granted review, (3) and we affirm the court of
appeals.

I.


 The evidence showed that Edward James, a limousine driver, was stopped at the corner
of Westheimer and Loop 610 at 1:45 a.m., waiting for the light to change. Suddenly a purple
Corvette ran into the car behind Mr. James, veered toward the curb, and finally "jagged" back
to the left hitting the limousine. The Corvette ended up underneath the rear bumper of Mr.
James's limousine. Appellant was driving the Corvette. 

 Mr. James and a couple of his clients, professional football players, got out of the
limousine to inspect the damage. The football players said that appellant was drunk, and then
they got back into the car. Mr. James asked appellant for his driver's license and proof of
insurance. He noticed that appellant had alcohol on his breath, his speech was "blurry," his
eyes were "wiggling" and red, his balance was unsteady, and "he was backing up and holding
onto his car, propping himself up onto his car." Mr. James concluded that appellant was drunk. 
Appellant and Mr. James exchanged driver's license information, but appellant never gave Mr.
James his insurance documentation. Mr. James asked him to wait until the police arrived, but
after waiting for a while, appellant became very nervous. He said, "I'm going to have to go, 
I've got to go." Appellant got into his car and backed it up, tearing out part of the limousine's
back bumper. Mr. James said that appellant ran the red light as he drove west down
Westheimer at a high rate of speed.

 Meanwhile, several tow-truck drivers had arrived at the accident scene. Joseph Moore
was one of them. He noticed that the damage to the three cars wasn't too bad; they could all
still be driven. He thought that the parties could resolve the accident without the need for
police assistance. But there was a problem because appellant did not have the required
insurance information. Appellant "was reluctant to cooperate and he seemed agitated at the
fact that the limo driver wanted him to stay until the police arrived[.] [H]e wanted to leave and
he seemed really testy about the limo driver pressing him for the information that he needed." 
Appellant appeared to be under the influence of something. "His speech was slurred. He was
fumbling. He was agitated. . . . He didn't seem coordinated." Mr. Moore did not think it was
safe for appellant to leave the scene, so he "made the decision based on public safety and his
mannerisms that something needed to be done in an effort to try to stop him from harming
anyone else or himself." Mr. Moore was especially concerned because he didn't think that
appellant "ever looked to find out if any other traffic was coming" when he left the accident
scene. 

 Mr. Moore and about five other wrecker drivers followed appellant in their trucks
because they were "really uncomfortable with the fact that he was driving and at that time of
night there was a lot of people on the road and [they] felt like he was a danger to himself and
other people." They tried to stop him near the corner of Post Oak and Westheimer, but
appellant put his Corvette into reverse, backed up, drove partially up on the curb and went
around them. He then "whipped" into a parking lot and crossed it at 30 to 40 miles an hour,
came back out onto the road, "never hit[] his brakes, almost sideswipe[d] a car and proceed[ed]
westbound on Westheimer."

 Mr. Moore followed as appellant took two left turns and went the wrong way down West
Alabama into oncoming traffic. His driving was "[v]ery dangerous," so Mr. Moore followed
with his "overhead lights on to alert people that we are coming the wrong way." Mr. Moore
knew that he was taking a chance going down a one-way street, but "[m]y motive is public
safety." Then appellant drove west in the east-bound lanes head-on into heavy traffic on
Westheimer, so Mr. Moore crossed over the median and followed, going the right way. 
Appellant "whip[ped]" into a bar parking lot going "maybe 50 m.p.h." Mr. Moore followed,
along with other wrecker drivers who had caught up. They "corralled" appellant in the parking
lot. Mr. Moore got out and went up to appellant's Corvette, asked him to put the car in park
and give up the keys. When appellant told him "to 'F' off," Mr. Moore reached in to take the
keys "at which point I felt a cold object to the right temple of my head." It was a handgun. Mr.
Moore slid down beside appellant's car and sidled to the rear of the car until the police arrived
two or three minutes later.

 At the motion to suppress hearing, the trial judge asked appellant to specify his legal
issue, (4) and defense counsel stated,

 The sole argument . . . is whether the citizen who placed Mr. Miles under arrest
had probable cause to do so, number one. Whether it violated a law in order to
arrest Mr. Miles. Number three, whether a citizen has a right to pursue a person
if the citizen believes that that person committed a breach of the peace. 


After the trial judge denied the motion, appellant pled guilty and appealed those legal issues.

 The court of appeals determined that Mr. Moore did make a citizen's arrest, but that the
trial judge did not abuse his discretion in concluding that Mr. Moore had probable cause to
arrest appellant for driving while intoxicated. (5) Finally, the court of appeals disagreed with
appellant's assertion that Article 38.23 compelled the exclusion of any evidence resulting
from appellant's arrest because Mr. Moore violated various traffic laws in effecting the arrest. 
It noted that a violation of law does not always invoke the provisions of Article 38.23 because
the primary purpose of that statute "is to deter unlawful actions that violate the rights of
criminal suspects." (6) Thus, the "'law which is violated in obtaining evidence must exist for the
purpose of regulating the acquisition of evidence to be used in a criminal case.'" (7) Noting that
the laws regulating the flow of traffic do not fall into that category, the court then held that Mr.
Moore's actions, though perhaps dangerous, did not implicate Article 38.23. (8)

II.


 Article 38.23(a), the Texas exclusionary statute, states,

 No evidence obtained by an officer or other person in violation of any
provisions of the Constitution or laws of the State of Texas, or of the
Constitution or laws of the United States of America, shall be admitted in
evidence against the accused on the trial of any criminal case. (9)


In this case, we must address two specific portions of Article 38.23: (1) whether an "other
person" may make a citizen's arrest for the misdemeanor offense of DWI, and (2) whether the
statute bars evidence obtained by an "other person" if that person violates traffic "laws of the
State of Texas" in the process of making a citizen's arrest. 

 The plain language of Article 38.23, like that of the Fourth Amendment to the United
States Constitution, appears to be relatively straightforward. But, like the Fourth Amendment,
its meaning and application are not always so simple. Scores of Supreme Court decisions have
explained the contours of constitutional search-and-seizure law and the exclusionary rule that
enforces its prohibitions. Thousands of federal and state cases have done the same. A six-volume treatise on the Fourth Amendment expands each year as courts and commentators
continue to construe the purportedly plain-language meaning of this short constitutional
provision. (10) Although the Texas exclusionary statute has not received anywhere near the
judicial or academic attention that the Fourth Amendment has attracted, it, too, is considerably
more complex in application than its simple words suggest. (11)

 In many respects, the Texas exclusionary rule mirrors the federal one. But Article
38.23(a), unlike the Fourth Amendment, applies to certain actions by private individuals as well
as those by government officers. To understand which actions and why, we examine the
historical context in which Article 38.23 was enacted.

A. The History of the Texas Exclusionary Statute.

 In 1922, the Court of Criminal Appeals decided Welchek v. State. (12) In that Prohibition-era case, a sheriff and "a number of other gentlemen" had "been waiting and looking for" the
defendant to drive down the road. When they saw him approach, they stopped his car and seized
three one-gallon jugs of whiskey from it even though they did not have a warrant. (13) This
confiscation was, according to the Court, a common scenario and the "question of search and
seizure is now being raised in nearly all liquor cases tried in this State[.]" (14) The Court rejected
the argument that the search-and-seizure provision of the Texas Constitution contained an
implicit exclusionary rule. (15) It specifically rejected the reasoning of those United States
Supreme Court cases that had imposed an exclusionary rule on federal courts under the Fourth
Amendment. (16) The Court rested its decision both on its reasoning that the Texas Constitution
did not expressly or implicitly contain any such exclusionary rule and on its view of sound
public policy. (17)

 The Texas Legislature obviously disagreed with this Court's reasoning in Welchek. In
"an ambitious effort to undo Welchek," (18) the 1925 Legislature enacted Senate Bill 115, which
stated, "No evidence obtained by an officer or other person in violation of any provision of the
Constitution or laws of the State of Texas, or of the United States of America, shall be
admitted in evidence against the accused on the trial of any criminal case." (19) Senate Bill 115
was codified as Article 727a of the 1925 Code of Criminal Procedure, and, between 1926 and
1928, this Court reversed at least thirty-four convictions based upon the new statutory
exclusionary rule. (20) Thirty-two of those cases were prohibition liquor cases. (21) 

 In applying this exclusionary rule, we stated that "[t]he manifest purpose" of Article
727a "was to reverse the rule applied by this court in the Welchek case[.]" (22) The Legislature
thus "sanctioned the construction by the Federal courts of the search-and-seizure clause of the
[federal] Constitution." (23)
 But if the legislative purpose of Article 727a was to enact a Texas
exclusionary rule just like the federal rule, why did the statute bar evidence illegally obtained
by any "other person" as well as by law enforcement officers? Surely the 1925 Legislature
knew that, in 1921, the Supreme Court had explicitly held that the federal exclusionary rule
applied only to government actors, not private individuals. (24) 

 The Texas Legislature enacted an exclusionary rule broader than its federal counterpart (25)
precisely because of the Welchek scenario and the "widespread problem of vigilante-type
private citizens [acting] in concert with the police conducting illegal searches for whiskey." (26) 
Long before national Prohibition laws were enacted, Texas had created its own local-option
liquor and prohibition laws. (27) Enforcement of these local-option laws led to the formation of
various citizen groups, including the "Law and Order League," whose members pledged to aid
officers to enforce the laws, especially local-option laws, and to "'clean up' their town and
county of crime[.]" (28) Presumably, the Legislature foresaw that, if the exclusionary rule applied
only to government officials or their agents, these "Law and Order League" members might
well continue their illegal search-and-seizure operations without the participation or
supervision of police officers. (29) Then these vigilante members would hand over the illegally
seized evidence, on a "silver platter," to government officers for use in criminal trials. (30) To
avoid the prospect of implicitly encouraging or condoning vigilante action by these citizen
groups, the Legislature applied its statutory exclusionary rule to both law-enforcement
officers and private persons. (31) 

 As Presiding Judge McCormick noted in his dissent in Johnson v. State, "Deterrence
of police illegality is the 'core' rationale for applying the federal exclusionary rule," but that
rationale has considerably less force when "private persons acting in a purely private capacity
illegally obtain evidence." (32) Presumably, the 1925 Legislature believed that this deterrence
rationale operated with considerably greater force during the era of the "Law and Order
Leagues." Until the Legislature itself decides that the type of vigilante action prevalent during
the early Prohibition era is no longer a threat to the privacy interests of Texas citizens, we are
bound to follow both the plain language and the manifest legislative intent of the original
Article 727a (recodified almost verbatim as Article 38.23(a)). The Texas exclusionary rule
applies to illegal searches or seizures conducted by law enforcement officers or "other
persons," even when those other persons are not acting in conjunction with, or at the request
of, government officials. 

 Thus, the plain language and history of Article 38.23 lead to an inescapable conclusion: 
if an officer violates a person's privacy rights by his illegal conduct making the fruits of his
search or seizure inadmissible in a criminal proceeding under Article 38.23, (33) that same illegal
conduct undertaken by an "other person" is also subject to the Texas exclusionary rule. If the
police cannot search or seize, then neither can the private citizen. Conversely, if an officer
may search or seize someone under the particular circumstances, then the private citizen's
equivalent conduct does not independently invoke the Texas exclusionary rule, and the evidence
obtained by either the officer or the private person may be admissible. 

B. Searches and Seizures Conducted by "Other Persons."

 Few Texas cases have discussed the types of searches and seizures conducted by private
citizens that are illegal for purposes of the Texas exclusionary rule. (34) In Gillett v. State, (35) this
Court declined to address whether the search of a dressing room by a Foley's Department
Store security officer constituted an illegal search by a private person. Instead a majority of
the Court held that the defendant did not have an objectively reasonable expectation of privacy
in the dressing room because signs were posted saying that the dressing rooms were
monitored. (36) Thus, evidence obtained from such a search, whether undertaken by an officer or
a private security guard, was not barred by the Texas exclusionary rule.

 In Stone v. State, (37) this Court stated that a babysitter, taking care of the defendant's
children, had permission to return to the defendant's home to retrieve diapers and other baby
supplies when she saw a stack of photographs on the bedroom dresser and looked through
them. (38) The photographs depicted the defendant and his wife having oral sex with a
neighborhood child. The babysitter took the photographs to the apartment manager who then
gave them to the police. This Court held that the babysitter did not commit theft when she took
the pictures because she had no "intent to deprive" the owner of his property. (39) Thus, she
committed no illegal act in seizing the photographs and turning them over to the police. (40) 
Although this Court did not mention it, an alternate rationale for its holding might be that if a
law enforcement officer had been standing in the shoes of the babysitter who was legitimately
in the bedroom, he could have seized these photographs if they were in plain view and clearly
depicted sexual assault of a child. (41) Had the search and seizure been made by an officer, the
fruits of a "plain view" seizure would not be excluded under Article 38.23(a). Thus, the fruits
of the babysitter's seizure would not be excluded under the rule.

 Similarly, in Cobb v. State, (42) this Court held that five knives that the defendant's father
took from the defendant's apartment were not inadmissible under Article 38.23. The father
was legitimately in the apartment at the request of the defendant's live-in girlfriend to retrieve
her car keys and he took the knives, not with the intent to steal them, but to give them to the
police. (43) The defendant's father thought that the knives were connected to the capital murder
investigation of his son. (44) Thus, he did not take the knives with the "intent to deprive" the
owner (his son and his son's girlfriend) of them. In Cobb, as in Stone, the Court could have
analyzed the issue according to the original rationale of Article 38.23. (45) Had a police officer
been requested to enter the defendant's apartment to retrieve the car keys and had that officer
seen the knives in plain view on the kitchen counter, he could have seized them if he
immediately recognized them as incriminating evidence in the capital murder investigation. (46) 
If the officer's seizure under Article 38.23 would not be unlawful, then the citizen's seizure
would not be unlawful. 

 Conversely, in State v. Johnson, (47) this Court held that evidence seized by the
decedent's sons who purportedly "burglarized" the funeral home jointly operated by the
defendant and the decedent was inadmissible under Article 38.23. Neither they nor police
officers had permission to enter the funeral home. Thus, neither an officer nor the citizens
were legitimately in the funeral home, and neither could make a warrantless seizure of those
items. What the police could not do, the decedent's sons could not do either. (48) Similarly, in
Jenschke v. State, (49) we held that the parents of a child (who had said that the defendant sexually
assaulted her) acted illegally when they broke into the defendant's truck and took a used
condom from inside it without the intent to immediately turn it over to the police. An officer,
standing in the parents' shoes, could not have entered the defendant's garage, found the key to
the truck, unlocked it, and made a warrantless search of that truck without permission or other
exigent circumstances. Thus, neither could the citizens. (50) 

 None of these cases was explained on this basis, but this rule-that a private person can
do what a police officer standing in his shoes can legitimately do, but cannot do what a police
officer cannot do-would explain the outcome in each case and is consistent with the purpose
of Article 38.23. (51) We conclude that the historical rationale for including unlawful conduct
by an "other person" under the Texas exclusionary statute is best explained and implemented
by this rule. C. Texas Law Allows a Citizen's Arrest for DWI.

 Article 38.23 is not the only statute governing the conduct of citizens in the search-and-seizure arena. Under Texas law, neither officers nor citizens have an unfettered right to arrest
a person. They may do so only under limited, statutorily-authorized, circumstances set out in
Chapter 14 of the Code of Criminal Procedure. Article 14.01(a) provides: 

 A peace officer or any other person, may, without a warrant, arrest an offender
when the offense is committed in his presence or within his view, if the offense
is one classed as a felony or as an offense against the public peace. (52)


Article 14.01(b) provides that peace officers may arrest an offender without a warrant "for any
offense committed in his presence or within his view." (53) Thus, a peace officer may arrest
offenders for any misdemeanor committed within his view as well as any such felony, while
citizens may arrest only for a felony or a misdemeanor that is "an offense against the public
peace." (54)

 Professor Dawson has noted, "In one sense, of course, all criminal violations are
offenses against the public peace." (55) Such a broad interpretation of "public peace" would make
Article 14.01(a) unnecessary. Under that broad interpretation, both officers and citizens would
be able to arrest for any offense committed within their view or presence, but Article 14.01(b)
explicitly limits such a right to peace officers. As Professor Dawson explains, Texas courts
have developed two independent lines of cases interpreting what constitutes "offenses against
the public peace" under Article 14.01(a). (56) First, some cases have held that only those
misdemeanor offenses listed in Title 9 of the 1925 Penal Code are "offenses against the public
peace" under the citizen-arrest statute. (57) Second, some cases have equated "offense against the
public peace" with "breach of the peace." (58) Under this second line of cases, a valid citizen's
arrest for a misdemeanor required "some showing of actual or threatened violence." (59) In
Woods v. State, (60) we quoted Corpus Juris which explained that the term "breach of the peace"
included 

 all violations of the public peace or order, or decorum; . . . a disturbance of the
public tranquillity by any act or conduct inciting to violence or tending to
provoke or excite others to break the peace; a disturbance of public order by an
act of violence, or by any act likely to produce violence, or which, by causing
consternation and alarm disturbs the peace and quiet of the community. . . .
Actual or threatened violence is an essential element of a breach of the peace. (61)


We then concluded that whether a specific act constituted a breach of the peace depended upon
the surrounding facts and circumstances in the particular case. (62) In Woods, we held that the
defendant did not have a right to arrest the deceased who had assaulted the defendant's wife
because the deceased had already completed the assault and had left the scene. (63) "There was
nothing to suggest that the breach of the peace might be renewed or continued or that
appellant's pursuit of deceased was to prevent a renewal of the offense." (64) Thus, in Woods, we
reaffirmed our earlier rule of law:

 the right of a private individual to arrest without warrant for a breach of the
peace, committed in his presence or view, is limited to the time the offense is
committed or while there is continuing danger of its renewal, and does not
include the right to pursue and arrest for the purpose of insuring the
apprehension or future trial of the offender. (65)

We have also indicated that some crimes are, by their very nature, offenses against the public
peace. These include public drunkenness (66) and driving while intoxicated. (67) But, as Judge
Davidson noted in his dissent in McEathron v. State, (68) this may be too broad a position. (69) One
can imagine a scenario in which a person, though intoxicated, poses no threat to the public
peace at the time that an officer or private citizen makes a warrantless arrest. 

 The statutory authorization for both officers and citizens to arrest for an "offense
against the public peace" codifies an "exigent circumstances" exception to the warrant
requirement. This exception to the warrant requirement is like that set out in Article 18.16
which allows "any person"-officer or citizen- to make a warrantless arrest to prevent the
consequences of theft-the escape of the thief and the disappearance of the property stolen. (70) 
Similarly, under Article 14.04, an officer may make a warrantless arrest when he has
"satisfactory proof" to believe that a person has committed a felony offense and is about to
escape. (71) In all of these statutes, the Legislature codified a preference for arrests under
warrant. But it also recognized that under some circumstances there is no time to procure a
warrant. These exigent circumstances require an immediate arrest and include 1) offenses
committed in the presence or view of an officer or citizen that pose a continuing threat to the
public peace, (72) 2) theft offenses in which the perpetrator may disappear along with the stolen
property, (73) and 3) escapes of felony offenders. (74) One might even conclude that the statutory
right to make a warrantless arrest under Article 14.03 when the offender is found in a
"suspicious place" is yet another codification of the exigent circumstances exception to arrest
under warrant. (75)

 Based on the history and purpose of Article 14.01(a), as well as precedent, we reaffirm
the reasoning in Woods and conclude that a citizen may make a warrantless arrest of a person
who commits a misdemeanor within the citizen's presence or view if the evidence shows that
the person's conduct poses a threat of continuing violence or harm to himself or the public.
It is the exigency of the situation, not the title of the offense, that gives both officer and citizen 
statutory authorization to protect the public from an ongoing threat of violence, harm, or
danger by making a warrantless arrest.

 With this general framework of Article 38.23(a) in mind, we turn to the circumstances
in this particular case.

III.


 Appellant claims that (1) Mr. Moore lacked any legal authority to arrest appellant; and
(2) even if he did have authority to arrest appellant, the evidence obtained as a result of that
arrest was inadmissible because Mr. Moore violated traffic laws in the process of effecting
that arrest. 

A. Mr. Moore had authority to arrest appellant under Article 14.01(a).

 Appellant acknowledges that this Court has previously held that driving while
intoxicated is a breach of the peace, (76) but he claims that Romo confused "breaches of the
peace" with "offenses against the public peace." This is a semantic difference without a legal
distinction under Article 14.01(a). The relevant legal issue is whether (1) Mr. Moore had
probable cause to believe that appellant was driving while intoxicated in his view, and (2) the
evidence showed that appellant's commission of this offense, if not stopped, posed an ongoing
threat of violence or harm to appellant or others. (77) 

 In this case, the evidence shows that Mr. Moore clearly had probable cause to believe
that appellant was driving while intoxicated on "something" when he left the scene of the
accident. Mr. Moore was not alone in forming the opinion that appellant was intoxicated, and
Mr. Moore was not alone in seeing that appellant left the scene at a high rate of speed. 
According to one witness, he ran a red light while leaving the scene. Such driving, especially
while intoxicated, posed a danger to pedestrians and other drivers on the road. Indeed,
appellant had already caused a three-car accident, so Mr. Moore's concern was well-founded.
The evidence showed that there were numerous other cars traveling on Westheimer at this time
of night. Mr. Moore testified that he pursued appellant "based on public safety" and because
he thought "something needed to be done in an effort to stop him from harming anyone else
or himself." Appellant's driving down Westheimer was "very dangerous." He "whipped" in and
out of a parking lot at high speeds, almost sideswiped another car, and turned down West
Alabama, a one-way-street, going the wrong way into oncoming traffic. Then he drove the
wrong way into heavy traffic on Westheimer. Appellant's conduct indisputably posed a
continuing danger to himself and others. This ongoing, potentially lethal conduct was, under
any definition of the term, both a breach of the public peace and an offense against the public
peace. Clearly, no one-neither citizen nor police officer- must obtain an arrest warrant before
attempting to protect the public welfare from this type of reckless driving while intoxicated. 
These are precisely the type of exigent circumstances that the Texas Legislature envisioned
when it explicitly authorized a citizen's arrest for an offense against the public peace. (78) Thus,
Mr. Moore was legally authorized to make a citizen's arrest of appellant under Article
14.01(a). 

B. Mr. Moore Did Not Violate Appellant's Legitimate Privacy Rights While Making
an Authorized Citizen's Arrest.


 Appellant claims that Mr. Moore violated a traffic law by following appellant down
West Alabama, a one-way street, in the wrong direction and by driving "recklessly" in his
attempt to stop appellant from driving recklessly while intoxicated. Appellant argues that,
because Mr. Moore violated the same traffic laws that appellant was violating, his conduct was
illegal and hence any evidence obtained as a result of Mr. Moore's emulation of appellant's
driving was inadmissible under Article 38.23. 

 This is an argument that the United States Supreme Court recently rejected with regard
to the pursuit of a reckless driver by police officers: "[W]e are loathe to lay down a rule
requiring the police to allow fleeing suspects to get away whenever they drive so recklessly
that they put other people's lives in danger." (79) The Supreme Court pointed to the obvious
perverse incentives of such a rule: a "fleeing motorist would know that escape is within his
grasp, if only he accelerates to 90 miles an hour, crosses the double-yellow line a few times,
and runs a few red lights." (80) Instead, the Court adopted "a more sensible rule: A police
officer's attempt to end a dangerous high-speed car chase that threatens the lives of innocent
bystanders does not violate the Fourth Amendment, even if it places the fleeing motorist at risk
of serious injury or death." (81)

 Appellant poses the issue as one involving a citizen's violation of "a traffic law" for
purposes of Article 38.23, (82) but that misconceives the real issue. The issue is whether an
officer or private citizen, engaged in an authorized pursuit of a fleeing suspect, may violate
certain laws in order to follow or stop that suspect. (83)

 Appellant admits that a police officer would have been justified in violating traffic laws
had an officer been attempting to arrest appellant. (84) Thus, according to appellant, had Officer
Obie been standing in Mr. Moore's shoes, he would have been authorized to follow appellant
the wrong way down a one-way street. But following the original rationale and purpose of
Article 727a outlined above, if a peace officer may search or seize the defendant under the
particular circumstances, the evidence obtained by a private citizen who does so is not barred
by the Texas exclusionary statute. (85) 

 Of course, there might be situations in which the conduct of the police officer or
citizen in making an arrest is constitutionally unreasonable under the circumstances. (86) But in
this case, Mr. Moore did not increase the risk to public safety and welfare by attempting to
stop appellant in the manner that he did. Quite the contrary, the evidence shows that by
following appellant down the one-way street with his overhead lights flashing, he warned the
oncoming traffic of the danger appellant posed to other drivers. (87) 

 For purposes of Article 38.23(a), the issue is whether Mr. Moore was legally
authorized to make a citizen's arrest under these particular circumstances, and whether he
effectuated that arrest in a reasonable manner- a manner that a peace officer, standing in the
citizen's shoes, could have legally done under the Fourth Amendment-and without significantly
increasing the risk of danger and harm to the public welfare. (88) 

 Granting the appropriate deference to the trial court's determination of historical facts,
we conclude, as did the court of appeals, that "the trial court did not abuse its discretion in
finding that Moore possessed probable cause to arrest appellant for DWI . . . [and] that
Moore's traffic violations did not implicate Article 38.23." (89) We therefore affirm the
judgment of the court of appeals.


Delivered: October 17, 2007

Publish
1. Tex. Code Crim. Proc. art. 38.23(a).
2. Miles v. State, 194 S.W.3d 523, 528 (Tex. App.-Houston [1st Dist.] 2006).
3. We granted appellant's sole ground for review:

 The court of appeals erred by holding that article 38.23 does not exclude evidence
obtained through the violation of traffic laws.
4. The conscientious trial judge asked clarifying questions of the witnesses and requested the
parties to explain fully their positions on the legal issues presented. This procedure protected the
parties and judge from any appellate misunderstanding about either the pertinent facts or legal issues
that were litigated. 
5. Miles, 194 S.W.3d at 527-28.
6. Id. at 528.
7. Id. (quoting Carroll v. State, 911 S.W.2d 210, 221 (Tex. App-Austin 1995, no pet.)).
8. Id.
9. Tex. Code Crim. Proc. art. 38.23(a).
10. Wayne R. LaFave, Search and Seizure (4 ed. 2004).
11. This Court has been criticized for failing to provide much guidance in the underlying purpose
or interpretation of that statute. Over twenty-five years ago, Professor Robert O. Dawson lamented:

 After fifty-five years, the meaning of article 38.23 remains a mystery. We may
divine some shadowy outlines of its scope only from the bits and pieces of opinions that
occasionally address quite narrow issues under the statute. Nowhere, however, does
the Texas Court of Criminal Appeals favor us with a discussion of what its philosophy
will be for adjudications under the statute and thereby provide the interpretive
guideposts that we need so badly. Until it does, we must squint and grope.

Robert O. Dawson, State-Created Exclusionary Rules in Search and Seizure: A Study of the
Texas Experience, 59 Tex. L.Rev. 191, 253 (1981) (hereafter cited as Dawson); see also Matthew
W. Paul, Surmounting the Thorns of Article 38.23: A Proposed Interpretive Guideline for the
Texas Statutory Exclusionary Rule, 46 Baylor L. Rev. 309, 352-53 (1994) (urging Texas courts to
"discard the simplistic notion that all outstanding issues which arise under the statute may easily be
resolved merely by application of the plain language of Article 38.23, without consideration of policy or
the purpose of the statutory exclusionary rule," and noting, "[I]f interpretive guidelines are to be
established, Texas courts must concentrate on interpreting the flexible statutory language in light of the
statute's history and purpose."); Nathan L. Mechler, Comment: Texas's Statutory Exclusionary
Rule: Analyzing the Inadequacies of the Current Application of "Other Person[s]" Pursuant to
Article 38.23(a) of the Texas Code of Criminal Procedure, 36 St. Mary's L.J. 195, 235-36
(2004) (noting that the Texas exclusionary rule "is still unclear and its interpretation has been the topic
of numerous debates, despite its lengthy existence. . . . Article 38.23 will continue to be debated
because its results are unsatisfactory.").
12. 93 Tex. Crim. 271, 247 S.W. 524 (1922).
13. Id. at 274, 247 S.W. at 526.
14. Id. This Court noted that the "importance of the matter presented for discussion and the fact,
as above stated, that the question is being so universally raised appears to call for a rather extended
discussion and announcement by this court[.]" Id. at 275, 247 S.W. at 526.
15. 93 Tex. Crim. at 280-81, 247 S.W. at 529. The Court reasoned that the Texas Constitution
demanded only that one whose property was unlawfully seized had a right to sue for return of the
property and for punishment of the trespasser. Id.. at 280, 247 S.W. at 528.
16. Id. at 275, 247 S.W. at 526. The Court refused to follow Amos v. United States, 255
U.S. 313 (1921), a case that, like Welchek, involved the seizure of liquor because "the opinion in said
case rests upon a misapprehension of the purpose of the Fourth Amendment to the Federal
Constitution, which is substantially the same as Section 9, Article I of our State Constitution[.]" Id.
17. Id. at 280-81, 247 S.W. at 528-29. In response to the defendant's argument that exclusion
of unlawfully obtained evidence is necessary to punish those who make an illegal seizure, this Court
stated:

 [t]o reject such evidence for such reason . . . would in nowise be a punishment to the
officer but would rather be a hurt inflicted upon the people whose interest in the
punishment of crime suffers because the court may think the officer should be rebuked
for the manner in which he obtained the evidence.

Id. at 280, 247 S.W. at 529. 
18. See Dawson, at 196.
19. S.B. 115, 1925 Tex. Gen. Laws, ch. 49, 186-87. The Legislature also passed Senate Bill
174 which made a warrantless search a criminal offense. S.B. 174, 1925 Tex. Gen. Laws, ch. 149,
357-58. However, in 1929, the Legislature repealed this provision because it had "'the effect of
retarding and hindering the enforcement of the Criminal laws of this State, and of hampering and
embarrassing the Peace Officers of the State in the faithful execution of the laws.'" Dawson, at 200.
20. Dawson, at 199.
21. Id.
22. Chapin v. State, 107 Tex. Crim. 477, 484-86, 296 S.W. 1095, 1099-1100 (1927) (noting
that by passing Article 727a, "the Legislature indicated the desire to disapprove the refusal of this court
to follow the Federal courts in the holding by this court that evidence obtained through an illegal search
could be used in a criminal trial"); see also Craft v. State, 107 Tex. Crim. 130, 132, 295 S.W. 617,
618 (1927) (noting that when the Legislature passed Article 727a prohibiting the admission of evidence
illegally obtained, "it is believed that the courts of this state by such enactment were required to make
the same application of the principle involved as had theretofore been made by the Supreme Court of
the United States, and by the courts of other jurisdictions in excluding evidence obtained in violation of
the constitutional provisions"); Odenthal v. State, 106 Tex. Crim. 1, 13, 290 S.W. 743, 748 (1927)
(recognizing that Article 727a was intended to overrule Welchek); Brick v. State, 738 S.W.2d 676,
679 n.5 (Tex. Crim. App. 1987) (noting that Article 38.23 and the federal exclusionary rule share a
common purpose: "to deter unlawful conduct on the part of law enforcement personnel and to close
the doors of our courts to illegally obtained evidence").
23. Chapin, 107 Tex. Crim. 484, 296 S.W. at 1100; see also Chavez v. State, 9 S.W.3d 817,
822 (Tex. Crim. App. 2000) (Price, J., concurring) ("[I]t is virtually irrefutable that the Texas
Legislature enacted 727a, which is materially identical to today's Article 38.23, in order to provide
Texas citizens with the protections of the Fourth Amendment's exclusionary rule.").

24. Burdeau v. McDowell, 256 U.S. 465, 475 (1921) ("The Fourth Amendment gives
protection against unlawful searches and seizures, and . . . its protection applies to governmental action. 
Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign
authority[.]"); see also Walter v. United States, 447 U.S. 649, 656 (1980) (wrongful seizures by
private individuals do not invoke the Fourth Amendment or its exclusionary rule and thus such illegally
obtained evidence is admissible in criminal proceedings); United States v. Jacobsen, 466 U.S. 109,
113 (1984) (state action is required before Fourth Amendment is implicated).
25. See C. McCormick & R. Ray, 1 Texas Law of Evidence, § 473 (2d ed. 1956) ("The
Texas [exclusionary] statute lays down a rule far broader than that existing in any other state and goes
much beyond the doctrine of the Boyd and Weeks cases. In the first place, while the federal rule
excludes only evidence illegally obtained by federal officers, and those cooperating with them, the
Texas statute makes a clean sweep and excludes evidence thus obtained by anyone."). 
26. State v. Johnson, 939 S.W.2d 586, 591 (Tex. Crim. App. 1996) (McCormick, P.J.,
dissenting) (citing Charles P. Bubany & Perry J. Cockerell, Excluding Criminal Evidence Texas-Style: Can Private Searches Poison the Fruit?, 12 Tex. Tech L. Rev. 611 (1981)). 
27. See generally, 3 Vernon's Annotated Constitution of the State of Texas, A.
Thomas & A. Thomas, "Interpretive Commentary," 198, 199 (1955).
28. Counts v. State, 78 Tex. 410, 414, 181 S.W. 723, 725 (1916); Deadweyler v. State, 57
Tex. Crim. 63, 66, 121 S.W. 863, 865 (1909) (rejecting defendant's challenge to the array of jurors
because some of them were members of a "Law and Order League" that "was organized to see that the
law was enforced -- not only in local option cases, but in all violations of the law").
29. This Court had mentioned such joint officer-citizen searches and seizures in several early
cases. See, e.g., Bolt v. State, 112 Tex. Crim. 267, 268, 16 S.W.2d 235, 235 (1929) (noting that
"one of the jurors had prior to appellant's trial aided the officers in raiding some parties who had been
engaged in violating the liquor laws. One of the parties arrested had been placed in the custody of this
juror where he remained until he made bond."); Stach v. State, 97 Tex. Crim. 280, 280, 260 S.W.
569, 570 (1924) (justice of the peace and constable looked into defendant's window, saw him pouring
whiskey and water into soda bottles, and then took custody of the bottles); West v. State, 93 Tex.
Crim. 288, 289, 247 S.W. 534, 535 (1922) (noting that defendant's car, containing 81 bottles of
tequila, was stopped by sheriff acting with "another citizen").
30. See State v. Johnson, 896 S.W.2d 277, 294 (Tex. App.-Houston [1st Dist.] 1995)
(discussing "silver platter" doctrine in context of Article 38.23), aff'd, 939 S.W.2d 586 (Tex. Crim.
App. 1996).
31. See Gillett v. State, 588 S.W.2d 361, 370-71 (Tex. Crim. App. 1979) (Roberts, J.,
dissenting) ("Article 38.23 was enacted at a time when private persons frequently made unreasonable
searches and seizures, and it was a specific response to this Court's holding in a case that involved a
search in which private persons joined. To give full effect to the statute, we must hold that it applies to
evidence obtained through unreasonable searches or seizures that are made by officers or other persons
alike.").
32. See Johnson v. State, 939 S.W.2d 586, 590 (Tex. Crim. App. 1996) (McCormick, P. J.,
dissenting); see also Paul G. Reiter, Annotation, Admissibility, In Criminal Case, of Evidence
Obtained by Search by Private Individual, 36 A.L.R.3d 553, 558 (1971) (noting that courts have
generally held that the exclusionary rules, "although clearly appropriate as a means to deter improper
conduct by law enforcement officers because the police will alter their investigatory practices to secure
future convictions, would arguably not function as a deterrent to lawless private searches, since the
private individual, usually unaware of an exclusionary rule and motivated by reasons apart from, or in
addition to, a desire to assist in securing a criminal conviction, would be under no disciplinary
compulsion to obey it.").
33. Only those acts which violate a person's privacy rights or property interests are subject to
the state or federal exclusionary rule. See, e.g., Chavez v. State, 9 S.W.3d 817, 822-23 (Tex. Crim.
App. 2000) (Price, J., concurring). Judge Price, in his concurring opinion in Chavez, quoted
Professors Dix and Dawson in reaching the conclusion that

 Article 38.23 does expand the Fourth Amendment exclusionary rule in that private
citizens, not simply government actors, are estopped from illegally obtaining evidence
against a defendant. But the underlying theory of both the exclusionary rule and article
38.23 is the same: to protect a suspect's liberty interests against the overzealousness of
others in obtaining evidence to use against them. Thus, unless someone's privacy or
property interests are illegally infringed upon in the obtainment of evidence, the core
rationale for providing this prophylactic measure is not met and its use is unwarranted. 
To expand the breadth of 38.23 to any and every violation of Texas "law"-beyond
those that affect a defendant's privacy or property interests-is to ignore the basic
premise under which the statute was created and would lead to absurd results.

Id. at 822-23 (citation omitted); see also Roy v. State, 608 S.W.2d 645, 651 (Tex. Crim. App. 1980)
(reasoning that the primary purpose of Article 38.23 is to deter unlawful actions which violate the rights
of criminal suspects; when the purpose of the statute that is violated is unrelated to the rights of a
criminal suspect-like the assumed named statute here-the evidence is not obtained in violation of a law
within the meaning of Article 38.23); Pannell v. State, 666 S.W.2d 96, 97 (Tex. Crim. App. 1984)
(holding that a Disciplinary Rule of the Code of Professional Responsibility is not the type of law
referred to in Article 38.23 because violations of these rules are dealt with by means of administrative
mechanisms).
34. As noted above, numerous cases decided immediately after the enactment of Article 727a
(the forerunner of present Article 38.23(a)), had held that the exclusionary rule applied to joint officer-citizen illegal searches and seizures, but few cases involving purely private-citizen actions have reached
this Court. See Gillett v. State, 588 S.W.2d 361, 370 (Tex. Crim. App. 1979) (Roberts, J.,
dissenting) ("The question of the applicability of this statute [art. 38.23(a)] to the acts of private persons
has not been discussed by this Court[.]"). In Crowell v. State, 147 Tex. Crim. 299, 180 S.W.2d 343
(1944), this Court discussed the purported unlawful conduct of both a private citizen and officers who
repeated the private citizen's conduct. In Crowell, the defendant was prosecuted for keeping a bawdy
house in the tiny town of La Tuna. He argued that the testimony of a citizen who had peered into the
back window while walking through his yard should have been excluded under the Federal exclusionary
rule and Article 38.23 because the citizen was trespassing at the time. Id. at 302, 180 S.W.2d at 343. 
For the same reason, the defendant claimed that the testimony of two officers-who, when told by the
citizen of what he had seen, also peeked into the same window from the same vantage point-should
have been excluded. Id. at 302, 180 S.W.2d at 345. All three-two officers and one citizen-either
conducted illegal searches or none of them did. First, the Court relied upon Hester v. United States,
265 U.S. 57 (1924); Olmstead v. United States, 277 U.S. 438 (1928); and Goldman v. United
States, 316 U.S. 129 (1942), in concluding that the observations of both the citizen and the two
officers were not a "search" under the Fourth Amendment. 147 Tex. Crim. at 305, 180 S.W.2d at
347. Second, the Court rejected the defendant's claim that the three had obtained evidence in violation
of Article 38.23 because that statute "has application to the violation of laws of this State, and there is
no statute making it an offense merely to go upon the premises or property of another." Id. In
Crowell, then, neither the officers nor the citizen violated a statutory "law," and their conduct was not
illegal under Article 38.23.
35. 588 S.W.2d 361 (Tex. Crim. App. 1979).
36. Id. at 362-63. The dissent argued that this search was, in fact, unlawful under Article 38.23. 
Id. at 370-71 (Roberts, J., dissenting).
37. 574 S.W.2d 85 (Tex. Crim. App. 1978) (panel op.).
38. Id. at 87.
39. Id. at 88-89.
40. Id.
41. At the time Stone was delivered, the Supreme Court had not yet held that a police officer is
forbidden to make a "cursory inspection" of materials that are themselves in plain view to determine
whether they are evidence of crime. See Arizona v. Hicks, 480 U.S. 321 (1987). At the time of the
Stone appeal, Texas apparently followed an "open view" rule which, like the contemporaneous
holdings of the Fifth Circuit, did not prohibit officers from a cursory examination of materials to
determine their significance. See United States v. Roberts, 619 F.2d 379, 381 ("Police are not
required to ignore the significance of items in plain view even when the full import of the objects cannot
be positively ascertained without some examination."); Clark v. State, 548 S.W.2d 888, 890 (Tex.
Crim. App. 1977) (police officer was legitimately in defendant's bedroom when he saw an open box
beside the closet containing several magazines which depicted nude boys; the magazines were "in open
view" and "were not seized as the result of a routine search of the area").
42. 85 S.W.3d 258 (Tex. Crim. App. 2002).
43. Id. at 271; see also Bodde v. State, 568 S.W.2d 344, 352-53 (Tex. Crim. App. 1978) (en
banc) (upholding admission of evidence seized by defendant's landlady from defendant's apartment
after he had been arrested; "Since she was rightfully on the premises, whatever incriminating facts or
circumstances were discovered by her were admissible.").
44. Id. 
45. Id. at 588.
46. See Texas v. Brown, 460 U.S. 730, 738-39 (1983) (stating that the "plain view" doctrine is
not really an "exception" to the warrant requirement because the "'seizure of property in plain view
involves no invasion of privacy and is presumptively reasonable'"); see also Horton v. California, 496
U.S. 128, 133 (1990) (stating that if an item is already in plain view, neither its observation nor its
seizure involves any invasion of privacy under the Fourth Amendment); New York v. Class, 475 U.S.
106, 112 (1986) ("[T]he State's intrusion into a particular area cannot result in a Fourth Amendment
violation unless the area is one in which there is a constitutionally protected reasonable expectation of
privacy.").
47. 939 S.W.2d 586 (Tex. Crim. App. 1996).
48. Id. at 587 (noting that Article 38.23 "has always been thought to mean what it says-that is, to
include everybody within the scope of its exclusionary sanction").
49. 147 S.W.3d 398 (Tex. Crim. App. 2004).
50. See Gillett v. State, 588 S.W.2d 361, 370 (Tex. Crim. App. 1979) (Roberts, J., dissenting)
("To give full effect to [Article 38.23], we must hold that it applies to evidence obtained through
unreasonable searches and seizures that are made by officers or other persons alike").
51. One might argue that this interpretation of Article 38.23(a) could conceivably increase
vigilantism rather than decrease it as was intended by the 1925 Legislature. This has not been the
American experience. As noted above, the Fourth Amendment has never applied to the conduct of
private citizens, and we are unaware of any other state that applies its exclusionary rule equally to the
conduct of private citizens and to that of law enforcement officers. There is no evidence that these
states have experienced an increase in vigilantism as a result of their laws that decline to exclude the
fruits of private illegal searches. Texas, faced with a unique "Law and Order" League vigilante
problem in the early years of the twentieth century, addressed this problem by specifically applying its
exclusionary rule-whatever it may be-to both law enforcement and private citizens. Equally. There has
never been any suggestion in Texas law or our cases that the Texas exclusionary rule should be applied
more strenuously to the conduct of private citizens than it applies to that of law enforcement. 
52. Tex. Code Crim. Proc. art. 14.01(a).
53. Tex. Code Crim. Proc. art. 14.01(b).
54. Any person (an officer or a citizen), may prevent the consequences of theft by seizing stolen
items and taking them and the suspected thief to a peace officer without delay. Tex. Code Crim.
Proc. art. 18.16. This statute codifies a type of exigent circumstance-the supposed thief must be
detained or will likely escape, along with the property stolen, if swift action is not taken.
55. Dawson, at 228.
56. Id. 
57. Title 9 included offenses such as disorderly conduct, public intoxication, operating a
motorboat without a muffler, drinking liquor on a train, horse racing on a road or street, abusive
language, or littering in a parking area. All of these provisions were repealed in the 1974 Penal Code
and many have no current counterpart. Id. & n.240.
58. Id. at 229.
59. Id.
60. 152 Tex. Crim. 338, 213 S.W.2d 685 (1948).
61. Woods, Id. at 341, 213 S.W.2d at 687 (quoting Head v. State, 131 Tex. Crim. 96, 99, 96
S.W.2d 981, 982 (1936), which quoted 9 Corpus Juris, at 386-88).
62. Id. at 341, 213 S.W.2d at 687.
63. Id. at 344, 213 S.W.2d at 688-89.
64. Id. at 344, 213 S.W.2d at 689.
65. Id. at 343-44, 213 S.W.2d at 688; see also Irvin v. State, 563 S.W.2d 920, 923-24 (Tex.
Crim. App. 1978) (when record did not reflect "that the breach of the peace occurred in the presence
or view of the person making the arrest as required by Art. 14.01(a)," citizen arrest was illegal).
66. Heck v. State, 507 S.W.2d 737, 740 (Tex. Crim. App. 1974) ("Being drunk in a public
place is a breach of the peace.").
67. Romo v. State, 577 S.W.2d 251, 252-53 (Tex. Crim. App. 1979); McEathron v. State,
163 Tex. Crim. 619, 621, 294 S.W.2d 822, 823 (1956).
68. 163 Tex. Crim. 619, 294 S.W.2d 822 (1956).
69. Judge Davidson argued,

 The right of a private citizen to arrest his neighbor is therefore expressly limited by the
legislature of this state to two classes of offenses: those classed as felonies and those
classed as breaches of the peace. Nowhere does that statute, in so many words,
authorize a private citizen to arrest his neighbor when he finds him in a public place and
concludes that he is drunk and under the influence of intoxicating liquor -- and this,
without the neighbor being, in fact, in such condition.

Id. at 623, 294 S.W.2d at 824 (Davidson, J., dissenting). Judge Davidson noted that, prior to 1951,
this Court had held that a private citizen could not arrest another for public drunkenness because it was
not an offense "against the public peace." Id. at 623, 294 S.W.2d at 825. "The unlawful act of being
drunk in a public place has reference solely and alone to the condition or state in which the offender is
found. To be guilty it is not necessary that he utter a word, or do or perform any act with any intent or
purpose. Intent, or manner, is in no particular an ingredient of that offense." Id. at 626, 294 S.W.2d at
826-27. One could be peaceably drunk in a public place without creating any threat of violence,
disturbance, or breach of the public peace. But if a person is drunk in public and the evidence shows
that he currently poses a risk of violence or harm to himself or others, his drunkenness does constitute a
breach of the public peace.
70. Tex. Code Crim. Proc. art. 18.16; see Hepworth v. State, 111 Tex. Crim. 300, 303, 12
S.W.2d 1018, 1019 (Tex. Crim. App. 1928) (explaining Article 325 [predecessor to art.18.16];
holding that this statute explicitly permitted warrantless arrests and searches; "It is a wholesome statute
designed to give protection from thieves, and we have neither the inclination nor the legal right to nullify
its salutary provisions by declaring its operation to be controlled by the terms of the search and seizure
law, enacted long after Art. 325 and which neither expressly nor by necessary implication repeals it in
our opinion.").
71. Tex. Code Crim. Proc. art. 14.04
72. Tex. Code Crim. Proc. art. 14.01(a).
73. Tex. Code Crim. Proc. art. 18.16.
74. Tex. Code Crim. Proc. art. 14.04; see Dawson, at 224 (noting that this Court has applied
art. 14.04 "to exclude evidence that officers obtained when making warrantless arrests in homes, places
of business, or public places when the prosecution has been unable to show exigent circumstances
preventing the officers from obtaining a warrant").
75. Tex. Code Crim. Proc. art. 14.03. See Dyar v. State, 125 S.W.3d 460, 470-71 (Tex.
Crim. App. 2003) (Cochran, J., concurring) (arguing that Article 14.03 is a statutory codification of an
"exigent circumstances" exception to the warrant requirement).
76. Romo v. State, 577 S.W.2d 251, 252-53 (Tex. Crim. App. 1979).
77. See Woods, 152 Tex. Crim. at 341-42, 213 S.W.2d at 687-88; see also McEathron v.
State, 163 Tex. Crim. 619, 620-21, 294 S.W.2d 822, 823-24 (1956) (upholding citizen's arrest when
citizen saw defendant drive at a high rate of speed, drink from a bottle, strike the esplanade three times,
and run red lights); Turner v. State, 901 S.W.2d 767, 770-71 (Tex. App.-Houston [14th Dist.] 1995,
pet. ref'd) (relying on Woods and upholding citizen's arrest by private security officer for offense
involving a breach of the peace when circumstances showed it was night, the apartment complex had
previous incidents of criminal activity, defendant acted suspiciously, gave citizen a false name, and held
up a handgun); Crowley v. State, 842 S.W.2d 701, 704 (Tex. App.-Houston [1st Dist.] 1992, no
pet.) (relying on Woods and concluding that, under particular circumstances, failure to stop and give
information after traffic accident was an offense involving a breach of the peace); Estes v. State, 660
S.W.2d 873, 874-75 (Tex. App.-Fort Worth 1983, pet. ref'd) (citing Woods and holding that, under
the circumstances, obscene gesture constituted "fighting words" and was an offense constituting breach
of the peace; defendant, a senior at Grand Prairie High School had extended "his middle finger of his
right hand to Phillip M. Farris, principal of said school, during the commencement exercises on May 29,
1981"); Ruiz v. State, 907 S.W.2d 600, 603-04 (Tex. App.-Corpus Christi 1995, no pet.) (citing
Woods and concluding that DWI defendant committed breach of peace when he drove wrong way
down highway; "This type of conduct threatened danger and disaster to the community because
appellant's act of driving in the wrong traffic lane placed his own life and the lives of other motorists in
danger.").
78. Appellant argues that the phrase "offense against the public peace" in Article 14.01(a) is
unconstitutionally vague and therefore a nullity. Appellant's Brief at 17-18. Appellant notes that the
vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in
terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its
application[.]" Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). But Article 14.01 is
not a penal statute that defines a crime or requires or forbids certain conduct. This statute does not
govern appellant's conduct; rather it permits the private citizen to intervene when he sees another
person committing an offense that creates the immediate threat of harm or violence to the public peace. 
Appellant does not have standing to challenge the vagueness of a statute that affects the legality of Mr.
Moore's conduct. Appellant has standing, rather, to challenge the reasonableness of Mr. Moore's
conduct under either the Fourth Amendment or Texas statutes. See Parent v. State, 621 S.W.2d
796, 797 (Tex. Crim. App. 1981) ("when challenging the constitutionality of a statute, it is incumbent
upon the defendant to show that in its operation the statute is unconstitutional as to him in his situation;
that it may be unconstitutional as to others is not sufficient"); see generally, Broadrick v. Oklahoma,
413 U.S. 601, 610 (1973). Appellant's argument is akin to challenging the vagueness of the language
of the Fourth Amendment or Article 38.23. These provisions may indeed be vague, but they do not
proscribe or penalize the defendant's conduct; they regulate conduct by officers and citizens.
79. Scott v. Harris, 127 S.Ct. 1769, 1779 (2007).
80. Id. 
81. Id.
82. There might be situations in which evidence was illegally obtained by a government officer's
or private citizen's violation of traffic laws for purposes of Article 38.23, but no such scenario is
presented here. 
83. One can imagine the absurdity of holding that a fleeing suspect may violate any and all laws
with impunity, but his pursuer's similar conduct is unlawful, rendering any subsequent arrest illegal and
any evidence obtained as a result of that arrest inadmissible under Article 38.23. Burglars who are
seen by a neighbor jumping out of the homeowner's window laden down with jewelry, money, and
TVs could dash across a third person's lawn and then claim "King's X" if the pursuing neighbor
trespassed upon the third person's property. A fleeing murderer could claim "King's X" if a neighbor
who saw the shooting tackled the murderer-committing an assault upon him-in effecting a citizen's
arrest. And so forth. Clearly this is not the intent of the Texas exclusionary statute. Nor would it
constitute sound public policy.
84. Appellant's Brief at 14 (noting that the police "are procedurally excused from certain legal
violations" during hot pursuit or because of exigent circumstances because "such conduct is by
definition the peace officer's public duty"; "Section 9.21 of the Penal Code justifies a violation of law if
the peace officer 'reasonably believes the conduct is required or authorized by law, by the judgment or
order of a competent court or other governmental tribunal, or in the execution of legal process.'").
85. See, e.g., Chapin, Craft, Odenthal, Chavez, Gillett, Crowell, supra.
86. See Gillett v. State, 588 S.W.2d at 370-71 (Roberts, J., dissenting) (arguing, "To give full
effect to [Article 38.23], we must hold that it applies to evidence obtained through unreasonable
searches or seizures that are made by officers or other persons alike") (emphasis added). For
example, suppose the evidence showed that appellant had produced his insurance information, and the
parties had peacefully exchanged all pertinent information. Suppose also that appellant had departed
the accident scene in a careful manner and driven down Westheimer in obedience to all traffic laws. If
a citizen suddenly decided that appellant was driving while intoxicated and decided to make a citizen's
arrest by speeding up behind him, running red lights, and going the wrong way on a one-way street and
creating a danger to appellant and the public in the process, that conduct might be viewed as an
unreasonable violation of appellant's privacy rights under the circumstances. See Johnson, Jenschke,
supra.
87. The private citizen's conduct in these circumstances might well be viewed as one of "choice
of evils" or necessity justification. Under Section 9.22 of the Texas Penal Code,

 Conduct is justified if:
(1) the actor reasonably believed the conduct is necessary to avoid imminent harm;
(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary
standards of reasonableness, the harm sought to be prevented by the law proscribing the
conduct; and
(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise
plainly appear.

Had Mr. Moore been ticketed for either speeding or reckless driving, he could have asserted this
necessity justification for his conduct.
88. Scott v. Harris, 127 S. Ct. at 1778 ("In determining the reasonableness of the manner in
which a seizure is effected, 'we must balance the nature and quality of the intrusion on the individual's
Fourth Amendment interests against the importance of the governmental interests alleged to justify the
intrusion.' . . . Thus, in judging whether [Officer] Scott's actions were reasonable, we must consider
the risk of bodily harm that Scott's actions posed to respondent in light of the threat to the public that
Scott was trying to eliminate.") (internal cite omitted).
89. Miles, 194 S.W.3d at 528-29.